Filed Nov. 1, 1893.

———◆———

## No. 16,438.

## PETTIT v. THE STATE.

CONTINUANCE.—*Criminal Law.—Murder.—Absent Witness.—Sufficiency of Affidavit.*—In a prosecution against the husband for murder, by administering poison to his wife, an affidavit by the defendant, for a continuance because of the absence of a witness for the defense, stated that such witness resides at South Bend, Ind., but that she is temporarily absent on a visit at East Portland, Ore.; that the relations between such witness and affiant's family were of the most intimate character, and that she knows the relations that existed between affiant and his wife; that it will be claimed by the State on the trial that the married life of affiant and his wife was not happy, that on the day of her death affiant's conduct was unseemly, unnatural and indifferent as to his wife's death, being on said day under the influence of intoxicants, and that, as a motive for such crime, prior to the death of affiant's wife, he had become infatuated with another woman, and desired to get rid of his wife, that the appearance of affiant's wife after death indicated terrible suffering, and her hands and body were so distorted as to indicate death by strychnia poisoning, all of which claims, affiant says, are untrue; that such witness will testify that the married life of affiant and his wife was happy, that affiant did not act unseemly on the day of his wife's death, that affiant and his wife were affectionate with each other, that there was nothing unnatural in the appearance of affiant's wife after death; that such witness will testify to the condition of health of affiant's wife just previous to her death, a condition indicating malarial poisoning, all of which facts are true, and can be proven by no other witness.

*Held*, that the facts alleged were sufficient to entitle affiant to a continuance.

SAME.—*Diligence, When Sufficiently Shown.—Absent Witness.*—In such affidavit affiant further alleged, as to diligence, that he caused a subpœna to be issued for such witness; that it was issued, and sent to

the sheriff of St. Joseph county, where witness resides, more than thirty days before the time this case was set for trial; that affiant believed that the witness was in said county, and that the subpœna would be served; that a few days after the subpœna was sent he learned, for the first time, that the witness was away from home, and affiant wrote to such sheriff to ascertain if the subpœna had been served, and if not why not, but the subpœna was not returned until September 19, 1890, and was unserved; that affiant caused a letter to be written to South Bend, to ascertain where witness was and when she would return, and was advised of her whereabouts, and that she would likely not return until late in the fall; that thereupon affiant immediately caused a letter to be written to witness, stating that the cause was set for trial October 8th, and asking that she return for the trial, and that she telegraph immediately upon receipt of the letter whether or not she would be present, but that he has received no response thereto; that witness is simply temporarily absent; that such absence was not procured by affiant, or by any one in his behalf, with his knowledge and consent, and that said witness can be procured by the next term of court; that affiant is a poor person without means, confined in jail, and has done all he could to procure the presence of the witness at this trial.

*Held*, that the affidavit showed sufficient diligence on the part of affiant.

SAME.—*Sufficiency of Affidavit.—Statement of a Conclusion.*—In such affidavit, the allegation that the absent witness would testify that she saw the face, body, and hands of affiant's wife after her death, and that there was nothing unnatural about the appearance of her face, hands and body, should not be excluded on the ground that it is a mere conclusion.

SAME.—*Sufficiency of Statement.—Relevancy.*—In such affidavit the fact that the absent witness had no opportunity to know of the relation existing between affiant and his wife for two years prior to her death, except a visit of unknown duration, could not affect the relevancy of the testimony of her previous knowledge of their relations, on a presumption of a continuation of such relations.

SAME.—*Statement in an Affidavit Can Not be Used to Impeach a Subsequent Statement.*—Facts stated in an affidavit for a continuance, to obtain the testimony of absent witnesses, can not be considered by way of impeachment, in a subsequent application for a continuance on account of the absence of another witness.

EVIDENCE.—*Witness.—Statement Indicating Ill-Will Admissible by Way of Impeachment.*—A conversation had by a witness, indicating ill-will, or a feeling of hostility, against one of the parties, is admissible in evidence as affecting the weight of his testimony.

SAME.—*Domestic Relations.—Written Communications Between Husband*

*and Wife.*—When the issues of a case involve the relations existing between husband and wife, communications between them are admissible in evidence as an index to such relations.

CHANGE OF VENUE.—*Statement in Affidavit as to State of Feeling in Another County.*—*Discretionary Act.*—Statements in an affidavit for a change of venue, as to the state of feeling existing in another county against affiant, are for the purpose of enabling the court to exercise its discretion as to what county the cause shall be sent, are not binding upon the court, and may be disregarded in passing upon the application, and may be stricken out on motion, without error.

CRIMINAL LAW.—*Evidence.— Relevancy.—Murder.*—In an action for murder of the wife by her husband, the relations of the husband to a child of his and his deceased wife is not a proper subject of investigation.

From the Montgomery Circuit Court.

*A. L. Kumler, T. F. Gaylord, R. P. DeHart, T. F. Davidson, J. West* and *T. A. Stuart,* for appellant.

*A. G. Smith,* Attorney-General, *G. P. Haywood* and *A. B. Anderson,* for State.

HACKNEY, J.—The appellant was charged by indictment, in the Tippecanoe Circuit Court, with the murder of his wife, Hattie E. Pettit, by administering to her quantities of strychnine.

The venue of said cause was changed to the circuit court of Montgomery county, where, on the 20th day of November, 1890, after a trial occupying six weeks, he was convicted and his punishment fixed at imprisonment for life. He appeals to this court from the judgment of the lower court, and many questions are presented for review.

We are asked to pass upon the sufficiency of the evidence to warrant a conviction, and we have read much of the evidence, though it covers several thousand pages of typewritten record.

The prosecution rested upon circumstantial evidence, involving the appellant's loss of affection for his wife and his infatuation for Mrs. Whitehead, a widow with

means and the prospect of an inheritance of a considerable sum. This line of evidence necessarily brought forward the relations existing between the appellant and his wife during the period of their married life, also the acquaintance, association, and conduct of the appellant and Mrs. Whitehead during a period of two years or more, including their meetings in public and in private, at Shawnee Mound, the place of their residences, at Indianapolis and other places; also his conduct after the death of his wife, both before and after the burial of her remains.

The charges against him, upon the evidence, included neglect of his wife and his home, relations with Mrs. Whitehead, that, if not criminal, and if not affectionate, were at least of a very intimate social character, of a character that he, as a minister of the gospel, could not indulge, in justice to the ties which, before the God he professed to worship, bound him to Hattie E. Pettit; that ten or twelve days before his wife's death he sought strychnine of a druggist under unusual circumstances and conduct; his wife did not feel well, he gave her tea of the taste of which she complained, almost immediately following the drinking of a portion of the tea she was violently ill with symptoms indicating strychnia poisoning; after vomiting she became better, and expressed the belief that she had received poison, and that it might have been in the tea; later, and during her illness, he gave her a capsule, the contents of which is in dispute, and following this she was again violently ill with symptoms of strychnia poisoning; he gave her other medicines claimed by the State to have contained strychnia; that the condition of the limbs and parts of the body after death indicated strychnia poisoning; his conduct with the family of Mrs. Pettit, in promising to explain to them her death, and hastening away from

them without doing so, when he had had three weeks' leave of absence granted by his church, and other circumstances, which we will not repeat.

We do not say that these circumstances were given without attempted explanations, denials, and excuses, but they were of such strength and character that, in our opinion, they formed a proper case for the jury. If the evidence of the State was believed, the probabilities of guilt were strong, if not conclusive. But the conflict in the evidence, its weight and effect, were properly questions for the jury, and we will not consider them.

One of the alleged errors of the circuit court was in denying the appellant a continuance of the trial of the cause, as applied for on the 7th day of October, 1890. The cause had been set for trial on the 8th day of October, 1890, and when the 7th day of that month had arrived, the appellant filed his affidavit and motion for such continuance, in which it was shown:—

That appellant was charged with having feloniously caused the death of his wife, Hattie E. Pettit, by administering to her a certain poisonous drug called strychnine, at affiant's home, in Shawnee Mound, Tippecanoe county, Indiana; that affiant and one Elma C. Whitehead were jointly indicted for the murder of said Hattie Pettit; that they severed in their defense, and afterwards a *nolle prosequi* was entered in said cause against Elma C. Whitehead in the Tippecanoe Circuit Court, and the said case as to her was then ended; that affiant is not guilty of the crime charged against him, and if he can have a reasonable time given him to secure the attendance of his witnesses at the trial of this cause, he will be able to prove his innocence, and that he can not safely go to trial in this case at this term of court, because of the absence of an important and material witness, Emmeline C. Ford; that he was married to his said wife on

January 27, 1881, in the State of New York; that one child was born to them of their said marriage; that for about six months after their marriage affiant and wife lived at and near West Monroe, N. Y., and for the next six years they resided in St. Joseph county, Indiana; that affiant and wife came from St. Joseph county to Shawnee Mound, Tippecanoe county, Indiana, to reside, and resided there from that time until the death of his said wife; that said Mrs. Ford now resides, and for more than ten years last past, has resided in the city of South Bend, St. Joseph county, Indiana, but is now temporarily away from home, on a visit at East Portland, Ore.; that said Mrs. Ford is the aunt of said Hattie E. Pettit, and was for a long time almost a member of affiant's family; that the relations between Mrs. Ford and affiant's family were of the most intimate character; and that she was a warm friend of affiant's wife; that when affiant and wife came to Indiana in July, 1881, they went to the home of Mrs. Ford, and remained there until some time in August following, when they secured rooms about three blocks from the home of Mrs. Ford, and from that time, during all the time they lived in South Bend, Mrs. Ford was frequently at affiant's home, and affiant and family frequently at Mrs. Ford's; that Mrs. Ford frequently saw affiant and wife together, and that she is familiar with, and knows the relations that existed between affiant and his wife, the manner in which he treated his wife, and her conduct towards him; that in May, 1889, Mrs. Ford visited affiant's family at Shawnee Mound, and affiant's wife visited in South Bend in June, 1889, and shortly before her death, and was frequently at Mrs. Ford's home, and that Mrs. Ford's knowledge and means of observation of the conduct and relations between affiant and his wife continued down to the time of the death of Mrs. Pettit; that it will be

claimed by the State upon this trial that the married life of affiant and his wife had not been happy, and that affiant did not love his wife; that on the day of her death the conduct of affiant was unseemly, unnatural, and showed an indifference to the death of his wife; that he was on said day under the influence of intoxicants; and for the purpose of showing a motive for the commission of said crime, the State will claim that prior to the death of his wife affiant had become infatuated with the said Elma C. Whitehead, and had ceased to love his said wife, and desired to be rid of her. And affiant swears that said matters are not true. That affiant expects to prove by said Mrs. Ford, and she will so testify, that she had the aforesaid means of knowledge of the relations existing between affiant and wife, and of their conduct toward each other; that she had a personal knowledge of the manner in which affiant treated his wife, during all of his married life, and of the conduct of his said wife towards affiant; and that affiant at all times treated her in a kind, loving and affectionate manner, and their conduct was at all times kind, loving and affectionate towards each other; that affiant and his said wife did love each other, and that affiant and his wife frequently, in her presence, spoke of each other in a loving manner, and frequently used terms of endearment towards each other; and that affiant always spoke of his said wife in terms of praise, and never found fault with the conduct of his said wife; that said Mrs. Ford arrived at affiant's home, at Shawnee Mound, on the day of the death of affiant's wife, and remained there until the morning following, and said Mrs. Ford will testify that during most of said time she was in the presence of this affiant, and frequently conversed with him, and had abundant opportunities to observe the appearance and conduct of affiant, and that the appear-

ance and conduct of affiant at said time was natural and becoming, and was that of a devoted husband, and that he was not under the influence of intoxicants during said time. And affiant swears that the facts which will be testified to by said Mrs. Ford are true; that it will be claimed by the State, upon said trial, that affiant's conduct and relations with the said Elma C. Whitehead on the day of his wife's death were unbecoming and too intimate; but that the same are not true; and that Mrs. Ford will testify that from the time of her arrival at Shawnee Mound she (Mrs. Ford) occupied a room directly opposite and but a few feet distant from the room occupied by affiant, and that no one could approach the opposite room without attracting the attention of Mrs. Ford thereto, and that during her stay at the residence of affiant she was in and about the house at all hours, and that she witnessed nothing unbecoming or too intimate in affiant's manner or deportment towards Elma C. Whitehead; that the State will claim, on said trial, that the appearance of affiant's wife, after death, indicated terrible suffering, and her body and hands were drawn into a position that was unnatural, and such as generally follows a death caused by strychnine, but the affiant says the same is not true, and that said Mrs. Ford will testify that she saw the face, body, and hands of affiant's wife after death, and that there was nothing unnatural about the appearance or position of her face, hands, and body; that one of the important and material questions on the trial of this case will be whether said Hattie E. Pettit took or was given strychnine shortly before her death, and if so, whether it was given or taken accidently; that affiant will claim, on said trial, that his wife had, prior to her death, scattered strychnine through the cupboards, closets and dishes of her house for the purpose of driving away rats, and that if she took or was given strychnine, it was

given or taken accidentally; that it will appear in the evidence on said trial that a cat and two dogs were poisoned at affiant's house at Shawnee Mound, during his wife's lifetime, with strychnine, and that the State will claim that affiant administered said poison to said cat and dogs by way of experiment, so as to observe the effects of strychnine, but affiant says he did not administer said poison; that he expects to show, by said Mrs. Ford, that affiant's house at Shawnee Mound was overrun with rats, and that Mrs. Pettit obtained and used strychnine to rid the premises of said rats; that Mrs. Pettit told Mrs. Ford, on her visit at Shawnee Mound, about the cat and dog having been poisoned, and that she (Mrs. Pettit) had poisoned them herself in her efforts to rid the house of rats, and told Mrs. Ford of the way she had scattered the poison about her house, and that Mrs. Ford said to her that that was a dangerous way to rid herself of the vermin; that Mrs. Ford will testify that about the 14th of June, 1889, Mrs. Pettit went to South Bend on a visit, and during that visit Mrs. Pettit told Mrs. Ford about the second dog having been poisoned, which poison Mrs. Pettit herself had set out, and that she (Mrs. Pettit) also told Mrs. Ford, during this visit, that she had scattered strychnine in different parts of the house just before leaving home, on this last visit, just before her death, and that Mrs. Ford expressed a fear that some of the family would get some of the poison; that another material question in this trial will be whether affiant's wife died from acute malarial poisoning or other causes, and that it is necessary, in order to determine this question, to ascertain the condition of Mrs. Pettit's health before her death, and that affiant expects to show that Dr. J. W. Yeager, the physician who attended Mrs. Pettit during her last illness, frequently stated that she

was suffering from malarial poisoning, and said Dr. Yeager gave a certificate to the board of health that Hattie E. Pettit died of malarial poisoning, but that affiant is informed that said Dr. Yeager now intends to testify on this trial, that Hattie E. Pettit did not die of malarial poisoning, but from strychnine poisoning; that it is therefore important for affiant to prove that his wife was suffering from malaria; that affiant will have medical witnesses on said trial, and is informed, and believes, and so states, that the State will have medical witnesses on said trial, and that to enable him to propound hypothetical questions to said witnesses, and thereby obtain the opinions of said witnesses, as to whether his wife did die from malarial poisoning, it is necessary and material for him to show and prove the condition of his wife's health and the ailment she was complaining of at and just prior to her death, and that affiant expects to prove, by Mrs. Ford, and she will so testify, that while on her last visit to Mrs. Ford, Mrs. Pettit stated to her (Mrs. Ford) that she had not felt well all spring, and that a few days before Mrs. Pettit's return home, shortly before her death, she complained of not feeling well, and then complained of existing dizziness and pains in her back, head, and neck, and that affiant can prove these facts by no other witness than Mrs. Ford; that the said symptoms are symptoms of malaria, and that the medical witnesses produced at said trial will so testify; that it will be claimed by the State, as affiant is informed and believes, that the taking of his wife's remains to New York State to be buried, on the day following her death, was hasty and unnatural, and done to conceal the commission of the crime charged; that affiant expects to prove by said Mrs. Ford, and that she will so testify, if produced as a witness, that affiant and Mrs. Ford had a conversation regarding this matter, and affiant stated

that his wife, on the Sunday before her death, requested that if she should die she should be buried by the side of her father; and that Mrs. Ford said, and will so testify, that he owed more to affiant's family than to any one else, and that he should take the remains to New York as soon as possible, as the weather was very warm, and that with the best of care the body would not keep long, and that the remains ought to look as natural as possible for the friends in New York to see; that the State will claim that the packing of the trunks by Mrs. Whitehead for himself and child, for their trip to New York with the body of his wife, was unnatural, and showed an improper relation between them; that Mrs. Ford will testify that affiant said to Mrs. Whitehead in Mrs. Ford's presence that as she (Mrs. Whitehead) knew where everything was, she should pack his little daughter's trunk and things to be taken east, as she was to remain in New York with her aunt; and that most of little Dine's clothes were taken to the room where Mrs. Ford and Dine were, and there packed by Mrs. Whitehead; that the State will also claim that the telegrams affiant sent to relatives and friends, announcing his wife's death, were unnatural and untrue, and that Mrs. Ford will testify that said telegrams were prepared and read over to her and talked over with her before they were sent to the telegraph office; that affiant caused a subpœna to be issued by the clerk of Montgomery county on September 5th, 1890, and sent to the sheriff of St. Joseph county for said Mrs. Ford, a copy of which subpœna and return of the sheriff is set out in this affidavit; that said subpœna was issued and sent to St. Joseph county, where Mrs. Ford resides, more than thirty days before the time this case was set for trial, and that affiant, at that time, believed that said Mrs. Ford was in South Bend, and that said subpœna would be served,

and that she would be present at the trial at this term of court; that a few days after said subpœna was sent he learned for the first time that Mrs. Ford was away from home, and affiant wrote to the sheriff of St. Joseph county asking if the subpœna had been served, and if not, why not, but that said subpœna was not returned until September 19th, 1890, and that he is informed, and believes, that Mrs. Ford left home shortly before the subpœna was issued; that he then caused a letter to be written to South Bend to ascertain when Mrs. Ford would return, where she was, and where a letter would reach her, and was advised she would probably not be home until late in the fall; and that thereupon he (affiant) caused a letter to be written to Mrs. Ford, stating that the case was set for trial October 8th, and asking that she return for said trial, and asking that she telegraph immediately upon receipt of said letter whether or not she would be present, and that said letter was written immediately upon receiving Mrs. Ford's exact address, and on September 25th, 1890, as affiant is informed and believes; and that said letter was, as affiant is informed and believes, placed in an envelope, stamped, sealed and addressed to the address given him, and placed in the postoffice at LaFayette, Indiana, but that no letter or telegram or word was received from Mrs. Ford in answer to said letter, as affiant is informed and believes; that affiant had no information that Mrs. Ford was away, or that she was going away; that his counsel saw Mrs. Ford, before said subpœna was issued, and talked with her regarding the facts to which she would testify, and that she did not advise said counsel that she was going away; that she knew she was expected to testify as a witness to the facts set out herein, and promised said counsel to attend the trial of this cause; and that immediately upon hearing that she was away from home affiant set about endeavor-

ing to have her return to this trial; that affiant is in-
formed and believes that said Mrs. Ford is simply away
temporarily, and will return home in a short time; but
that since the issuing of said subpœna he has learned
that she will not return before about the last of Novem-
ber next; that he can not state the exact time of her re-
turn, but that he can obtain her presence at the next
term of this court; that affiant is a poor person without
means, confined in jail since December, 1889, and has
done all he can to procure the presence of said Mrs. Ford
as a witness at this trial; that the absence of said Mrs.
Ford has not been procured by any act or connivance of
this defendant, nor by others at his request, nor with his
knowledge or consent; that said witness will testify to
the facts hereinbefore stated, and that affiant believes
them to be true; and that he is unable to prove said facts
by any other witness whose testimony can be as readily
procured.

Counsel for the appellee inform us that the continu-
ance was denied on two grounds: "First, because the
affidavit did not show that the testimony of the wit-
ness would be material or competent, and, second, be-
cause it did not show due diligence to procure the testi-
mony of the witness." These grounds of objection to
the affidavit counsel for appellee ably endeavor to main-
tain, but we find it our duty to dissent from their con-
tention as to each objection. It will be observed that the
affidavit anticipates the line to be pursued by the prose-
cution in seeking a conviction, and that the line so an-
ticipated was that Mrs. Pettit died from strychnia poison-
ing; that the deadly drug was administered by appellant;
that his motive was in the loss of affection for his wife,
and the possession of an infatuation for Mrs. Whitehead.
Each of the elements of the case so anticipated, it was
further anticipated, was, in part, to be established by va-

rious facts and circumstances claimed by the prosecution to exist. As to each of such facts and circumstances, it was the right of the appellant to offer proper evidence, in denial or in explanation, or to raise a reasonable doubt. He was required to anticipate the case of the State, and to prepare, as far as possible, his evidence to meet it. If any part of his evidence was temporarily beyond the jurisdiction of the court, his only remedy was to apply for a continuance, and if, in his application, he showed all that the statute required of him, no discretion of the court, no misjudgment, no misapprehension of the facts stated, could deprive him of such continuance. While we can not, for the purpose of judging of the sufficiency of his affidavit, go to the evidence to learn whether he correctly anticipated the case to be relied upon by the prosecution, and while the lower court was required to consider the motion upon the facts alone as stated in the affidavit, we have looked into the evidence to learn if he was harmed by the ruling. We find not only that he correctly anticipated the elements of the case, but he correctly anticipated, in many respects, the evidence which would be offered to sustain such elements; and if the evidence of the absent witness was proper for any of the purposes we have mentioned, he has been harmed by the denial of his application.

One circumstance alleged to have been relied upon by the State, was that the appearance of the body, hands, and face of the remains of Mrs. Pettit were drawn out of natural position, and thereby indicated the unnatural condition which follows a death caused by strychnine. The affidavit stated that the absent witness would "testify that she saw the face, body and hands of affiant's wife after death, and that there was nothing unnatural about the appearance or position of her face, hands and body." The only reason given by the State for the ex-

Pettit *v*. The State.

clusion of this statement is, that it is not a statement of
facts, but is a mere conclusion. As to whether the hands,
face, and body were unnatural in appearance or position
became an important circumstance, and one afterward
proven and relied upon by the appellee. How should
the nonexistence of such condition be proven if not by
a statement that there was nothing unnatural in the ap-
pearance or position of the face, hands, and body? To
have stated that the hands were straight, or that the face
was not distorted, or that the body was not out of line,
would have been as to each but a mere conclusion in
the same sense that the evidence proposed would have
been a conclusion. The existence of unnatural condi-
tions may admit of detail in giving descriptive facts, but
the absence of such condition can best be proven in neg-
ative form, and not by detailing those conditions which
being present leave the inference of an absence of the
condition claimed to be present.

This must be true in all inquiries involving matters
of common observation. If it were otherwise, it could be
objected that a condition of darkness could not be proven
except by showing the absence of light, cold could not be
shown except by proving the absence of heat, and that a
color might not be identified except by proof of its con-
stituent shades. All are subject to the objection that
they are conclusions, if the proof offered is objectionable,
and any of the methods suggested for proving the con-
ditions supposed would be subject to the same objection,
and, therefore, no method of proving any such fact, how-
ever important, could be freed from such objection.

The value of the negative fact, and the impractica-
bility of establishing it by positive or affirmative facts,
render the denial of its existence necessary. This may
not be the rule where the negative fact is the subject of
special learning or scientific knowledge, but it must be

the rule where such fact is a matter of common observation, and within the knowledge alike of the learned and unlearned.

As another material question upon the trial, it was alleged that the prosecution would offer evidence tending to show a death by strychnia poisoning, and that the absent witness would testify that after the 14th day of June, 1889, and before the alleged poisoning, Mrs. Pettit had stated to the witness that she, Mrs. Pettit, had not felt well all spring, and that, only a few days before her death, she had further complained of then not feeling well and of existing dizziness and pains in her back, head and neck. The relevancy of this evidence was shown by the statement that the conditions so complained of by Mrs. Pettit were symptoms of malaria, and that medical witnesses would so testify upon the trial, and, further, that both he and the appellee would produce medical witnesses upon the trial, and that he must secure this evidence to be enabled to submit such symptoms in the hypothetical questions to be propounded to such witnesses, and thereupon obtain opinions as to whether death was the result of strychnia or malarial poisoning.

All that is claimed by the appellee against this evidence is the following:—

"In order to show that it was material to inquire into the question of malaria at all, it was necessary that appellant should allege in his affidavit that Mrs. Pettit died from that cause, and not from strychnia, as alleged in the indictment. This is not claimed in the affidavit, and it is very evident that a person suffering from malaria may be murdered by the felonious administration of strychnia, as well as a person in good health. He says he wishes to propound hypothetical questions to experts on this point, but does not allege that any one of them

will testify that the symptoms of the ailment from which she died were those of malaria. For all that is shown by the affidavit, the experts may have answered that they were not the symptoms of malaria."

It was not essential to the materiality of the offered evidence that it be shown that Mrs. Pettit died of malarial poisoning, and not from strychnia.

Considering the sufficiency of the affidavit in this respect, the evidence offered may be viewed as if the witness were before the court on behalf of the defendant. If the evidence tended to show a death from malarial poisoning, it was admissible. Whether it was sufficient to prove such death, was a question of its weight, and not of its admissibility. Its weight was a question for the jury, and it was not necessary that it should be found that death resulted from malarial poisoning, but it was quite sufficient if, from it, the jury should entertain a reasonable doubt as to the death from strychnia.

Counsel are mistaken in the assertion that it does not appear that the experts would testify that the symptoms proposed to be proven were those of malaria.

A further showing was that the appellee would rely upon testimony that on the day of his wife's death the appellant was under the influence of intoxicants, as a circumstance indicating a want of respect for her, and as evincing an indifference to her death. The opportunities of the absent witness to know of his conduct on the day of the wife's death, were shown, and it was alleged that she would testify that his conduct was not unbecoming, and that he was not under the influence of intoxicants. To this question the appellee has made no argument, and the appellant but suggests the admissibility of the proposed evidence in contradiction of a witness who testified for the appellee, that, on that occasion, the de-

fendant was jolly, and she believed him under the influence of liquor.

If the evidence of the appellee's witness was competent, the contradiction proposed was equally competent, and the evidence having been admitted, the proposed evidence could not have been rejected, if for no other reason than that one introducing incompetent evidence can not object that, having opened the door to the admission of such evidence, his adversary avails himself of the same privilege.

But we may not hold the proposed evidence material by searching the record beyond the affidavit. We can only say that a reference to the record fails to disclose that the appellant was not harmed by the refusal of his application. Regarding the question of the materiality of the evidence proposed as waived, excepting in so far as it would have contradicted evidence not subject to our inspection, we do not pass upon the question.

One of the vital elements of the appellee's case, in fact and in the anticipation of the appellant, as alleged in his affidavit for a continuance, was that the appellant entertained no affection for his wife, and much of the evidence proposed was competent and material upon this question. The relationship of Mrs. Ford to Mr. and Mrs. Pettit, and the acquaintance and association shown, gave her peculiar knowledge of the treatment by Pettit of his wife.

Counsel for appellee concede that evidence of the character proposed was competent upon the question of motive, but they say that the facts alleged show no opportunity to know anything of his treatment of her for two years, while the Pettits resided at Shawnee Mound, excepting that period covered by the visit of unknown duration, which was paid by Mrs. Ford to the Pettits, in May, 1889. The affection entertained by him for his

wife during the six years of his residence in South Bend, and his treatment of her during the visit of Mrs. Ford, however short that visit, were proper circumstances to go to the jury, and their weight was not a question for the court.   If the witness had not seen the Pettits during the last two years of Mrs. Pettit's life, it was proper to prove his affection for his wife before locating at Shawnee Mound, that the jury might weigh, with the other evidence, the presumption of a continuation of that relation which had existed prior to that period.   It was only upon this theory that the appellee was permitted to prove, by the witness Hickman, conversations with Pettit, in 1883, as to his neglect of his wife, and his agreeing with his mother and sister in their controversies with his wife.

We have shown sufficiently the error in holding that the proposed evidence was not material, and it remains to determine whether it was shown that the appellant was diligent in his efforts to procure the evidence of the witness before applying for the continuance.

The subpœna was issued, and sent to the proper sheriff on the 5th of September, 1890, more than thirty days before the day set for the trial.   Within a few days, he learned that the witness was away from home, and he thereupon wrote to the sheriff to learn if she had been served with said writ; that on the 19th day of September the writ was returned not served; that thereupon he took steps, by writing, to learn her whereabouts, and as to when she would return, and where a letter would reach her; that immediately upon receiving the information sought, and on the 25th day of September, he wrote to her at East Portland, Ore., where she was visiting, and urged her return for the trial, and requesting an answer by telegraph.   It thus appears that he first learned her whereabouts on the 25th day of September.   Up to this point there is little room for the charge of negligence.

He was certainly as diligent as could reasonably be required. But appellee's counsel urge that he should have procured an order of court for the taking of her deposition, and then have proceeded to East Portland and secured her testimony.

Taking the time necessary in preparing for such mission, giving the required notice, and in reaching that distant point, omitting the intervening two Sundays, and taking the deposition, and returning it for filing at least one day before the day on which the cause stood for trial, would have required extraordinary diligence, if not impossible haste. The court knew judicially that the distance to East Portland from Crawfordsville was two thousand three hundred and ninety-eight miles, and that, by the ordinary course and methods of travel, it required within a few hours of five days between the two points, or at least nine days continuous travel in going to and returning from East Portland. If notice of the taking of depositions could have been given on the 25th day of September, the day of the discovery of the whereabouts of the absent witness, and excluding the day of the giving of notice, and one of the two Sundays intervening between that date and October 7th, the day upon which the deposition was required to be filed, and but ten days remained in which to go to Portland, secure the attendance of the witness, take the deposition and return for the trial, including one of said two Sundays. Diligence could not be made to depend upon such narrow margins of time. He was without means, and confined in jail. Such steps require not only means, but willing assistants. It might be argued that assistance could have been procured by order of court, but to seek that aid would only consume further time necessary for the long journey. We can not believe that he failed in diligence.

We are urged to consider against the application the fact

that the appellant had, at a previous term of court, applied for a continuance to obtain the evidence of other witnesses who, it was alleged, would testify to his affection for his wife, and that in his said application he had sworn that he could not prove the same facts by any other witness whose testimony could be as readily procured. This would be but another method of considering counter-affidavits when, as we have said, the application is the only test of the appellant's rights. See *Cutler* v. *State*, 42 Ind. 244; *Eslinger* v. *East*, 100 Ind. 434.

But to permit the trial court to consider the former affidavit relating to the proposed evidence of witnesses, other than the witness for whose evidence a continuance was sought, would place that court in the position of deciding, without information, that the defendant had not been mistaken in his belief as to the proposed evidence of such other witnesses, or that he had, in said former affidavit, sworn falsely, and that such affidavit could be considered in impeachment of the latter application.

Whatever the rule, where both applications are for the taking of the evidence of the same witness, we can not adopt the rule here urged. We conclude that the continuance should have been granted.

To one Switzer, an important witness for the appellee, the following question was asked upon cross-examination:—

"Q. I will ask you to state if you didn't have this conversation with them (Julian and Wallace) at that time and place, or this in substance, 'Pettit is going to get out on bail, the justice of the peace says the case is bailable, but who will go on his bond?' Julian says, 'I will go on it for $4,000;' and Wallace says, 'I will go on it, too;' and you said, 'I wouldn't have any sympathy for you if you lost it all;' and Julian said, 'all

right, you will not have to pay it;' did you not have that conversation?   A.  That is not correct.

"Q.  Or in substance?   A.  Part of it is correct and part is not."

At the proper time, Julian and Wallace were called on behalf of the appellant and were asked severally the following question:—

"Q.  I will ask you whether or not, on the next day after the trial, the preliminary trial of Pettit, at La Fayette, that you met Mr. Switzer about a quarter of a mile north of Mr. Kincaid's, you and Mr. Wallace, and whether or not upon that meeting Mr. Switzer said to you, 'Pettit is going to get out on bail; the justice says the case is bailable, but who will go on his bail?'  To which you replied, 'I will go on for $4,000,' and Wallace said, 'I will go on, too;' to which Switzer responded, 'I would not have any sympathy for you if you lose it all;' to which you said, 'all right, you will not have to pay.'  That, or that in substance?"

The appellee's objection to this question was sustained by the court, and that ruling is urged as error.

The appellant contends that the statement of Switzer to Wallace and Julian was one of hostility or ill-will toward him, while the appellee insists that it was but an expression against the practice of becoming surety, and not an evidence of feeling or interest against Pettit.  No objection is made to the form of the question, but it is expressly stated that the question, with the questions immediately preceding it, was in proper form.

It is also conceded that if the conversation sought to be proven involved an expression of ill-will, or a feeling of hostility against Pettit, it was competent.  Such is the rule as held in *Scott* v. *State*, 64 Ind. 400; *Johnson* v. *Wiley*, 74 Ind. 233; *Stone* v. *State, ex rel.*, 97 Ind. 345; *Ford* v. *State*, 112 Ind. 373; *Skinner* v. *State*, 120 Ind.

127; *Staser* v. *Hogan*, 120 Ind. 207; *Schultz* v. *Third Ave. R. R. Co.*, 89 N. Y. 242; *Starks* v. *People*, 5 Denio, 106; *Geary* v. *People*, 22 Mich. 222; *Phenix* v. *Castner*, 108 Ill. 27.

The conversation, in our opinion, involves an effort on the part of Switzer, to deter Wallace and Julian from becoming surety for Pettit, and if this conclusion is correct, it involves the indirectly expressed belief of Switzer that, if released upon recognizance, Pettit would not remain and confront the charge against him, but that the sureties upon the bond would have to respond to a forfeiture. Such conclusion implies not only the belief that Pettit was guilty as charged, but that he was dishonest in not intending to remain and defend the charge, but to leave his sureties to meet the stipulations of the bond. Whether this effort to deter Wallace and Julian from becoming sureties, and whether the conclusions and implications following were from malice or interest, were questions for the jury. The feeling manifested was not that of a disinterested or sympathetic heart, but was that of a meddler, and not the ordinary conduct of one wholly disinterested and unbiased. The degree of interest, bias, or malice could be judged only by the jury, and the evidence should have been admitted.

Another question arising upon the record is as to the alleged error of the court in rejecting, as evidence for the defendant, a letter from Mrs. Pettit to her husband, containing expressions of endearment. It is urged by appellant's counsel that the letter was admissible, both in rebuttal of the theory of the husband's loss of affection for his wife, and in contradiction of Hickman as to complaints of the wife, heretofore given, and of Wilson, that Pettit was neglecting his wife in being from home days at a time without advising her of his whereabouts.

The record does not disclose that the court permitted

evidence of complaints by Mrs. Pettit; on the contrary, such evidence was expressly excluded. The evidence of Hickman and Wilson was of conversations between Pettit and themselves. The letter, therefore, was not admissible in contradiction of those witnesses. But, from our view of the question, it was proper to have admitted in evidence the letter of the wife to the husband. The relations existing between the deceased and her husband were naturally, and by the theory of the State's evidence, necessarily the foundation upon which the guilt of the defendant was to be determined. While indifference, or even ill treatment by the husband, does not necessarily destroy all the affection of the wife for him, yet the degree of that affection must, to a greater or less extent, depend upon his treatment of her. The relation of husband and wife is peculiar, in that all of the interests of life concern them alike, and are so inseparable from their thoughts of, and affections for, each other, that it can not be said, as a matter of law, that the estrangement of the husband necessarily destroys the affection of the wife for him. It necessarily follows that the existence of affection for him does not, of itself, preclude the loss of affection by him. Where the relation is the subject of inquiry, and where it becomes proper to investigate the treatment of one towards the other, with a view of determining that relation, it is proper to canvass the treatment of the other towards that one. The treatment by each of the other casts a light into the otherwise dark recesses of the heart of each. The strength of that light is a subject for the jury, and may not be determined as a question of law. The letter of a wife, with whose murder her husband was charged, though written to a third person, was held admissible "to disprove the existence of the motive to commit the murder, which the

testimony for the State conduced to establish." *State v.. Leabo*, 84 Mo. 168.

In that case the letter contained statements of the kindness of the husband. We are not required to hold that declarations or letters to third persons are admissible, but we do hold that communications between the husband and wife are an index to the relations existing between them.

It is contended that the court further erred in striking out parts of defendant's affidavit on motion for a change of venue from Tippecanoe county. The action complained of was in sustaining a motion by the prosecuting attorney, and the matter was not actually removed from the affidavit. The allegations thus withdrawn from consideration related to a state of feeling existing against the defendant in Montgomery county, and were included in the affidavit for the purpose of enabling the court to exercise its discretion as to what county the cause should be sent to upon the change prayed.

It is first urged that the application for a change of venue was not sworn to as modified by the action of the court in so sustaining said motion, and that therefore the action in granting the change was erroneous. The theoretical alteration of the affidavit did not alter the verification of the facts not so stricken out, nor did it vary, change, or modify the facts so remaining.

However, in permitting the change to be granted without asking to withdraw or amend the application was a waiver of the charge that the application was incomplete as granted. Secondly, it is insisted that the court erred in refusing to entertain the facts so stricken out, and to consider them in determining what its discretion as to the change of venue should be. Upon the motion the facts were brought to the attention and knowl-

edge of the court, and, in passing upon the application, we must presume that the court had not been divested of that knowledge, and we will treat the ruling upon the motion as amounting only to an expression of the court's unwillingness to be governed by the request of the defendant, when its discretion should be exercised. Such statements in affidavits are not binding upon the courts, and, if they may be disregarded in passing upon the applications, they may be stricken out upon motion without error. *Michigan Mutual Life Ins. Co.* v. *Naugle*, 130 Ind. 79.

The State offered evidence tending to show that the appellant had not entertained proper affection for his little daughter. The evidence arose incidentally, and related to specific acts. Its admissibility is not before us. In defense, the appellant introduced the testimony of a witness, Ollie Reese, that appellant was kind to the child. This evidence, on motion of the prosecutor, was, by the court, stricken out. This was not error. His relations to the child were not the proper subject of investigation, and the specific acts offered by the State could not be answered by general conduct.

There are other questions discussed, but having concluded that the judgment of the lower court can not stand, and that upon another trial such questions will not necessarily arise, we do not consider them.

The judgment of the circuit court is reversed, with instructions to grant a new trial, and the warden of the State's prison north is directed to return the appellant to the custody of the sheriff of Montgomery county.

Filed Oct. 19, 1893.