[No. 1908]

## STATE OF NEVADA, RESPONDENT, v. FRED SKINNER, APPELLANT.

[139 Pac. 773]

1. CRIMINAL LAW—ESCAPE PENDING APPEAL—DISMISSAL.
   A rule similar to that adopted by the California courts, under statutes similar to those of this state, of dismissing appeals taken by a defendant who thereafter escaped and who does not return to custody within a time specified, ought to be and, in future, doubtless will be applied.

2. CRIMINAL LAW—EVIDENCE.
   Where there is no witness to a homicide other than the defendant who becomes a witness in his own behalf and asserts self-defense and that deceased was the assailant, his version of the killing is subject to be tested by all the physical facts and such evidentiary facts and circumstances as would reasonably tend to throw any light upon the question, such as the relationship and the degree of affection and regard which the parties bore toward each other as bearing upon the question of the probability of who made the first assault.

3. HOMICIDE—EVIDENCE—DECLARATIONS OF DECEASED.
   In a prosecution for homicide, where the defendant, who was the only witness to the shooting, testified that he shot deceased, with whom he was living in adultery, in self-defense, a letter written to him by the deceased a short time before, in which she manifested the strongest affection for him, was admissible as tending to show the improbability of her attacking him.

4. CRIMINAL LAW—INSTRUCTIONS—REASONABLE DOUBT.
   In a prosecution for homicide an instruction on reasonable doubt, which contrasted the rule as to burden of proof in civil and criminal cases, and gave as the reason for the latter rule that "the charity of the law and its solicitude for the safety of the innocent are such that an artificial presumption of innocence attends a person accused of crime," was not an incorrect statement of the law because of the use of the words "charity" and "artificial," and could not have misled the jury, where it was one of nine instructions on the subject of presumption of innocence and reasonable doubt.

APPEAL from the Fifth Judicial District Court, Nye County; *Mark R. Averill*, Judge.

Fred Skinner was convicted of murder in the second degree, and he appeals. **Affirmed.**

*Bartlett & Thatcher* and *J. M. Frame*, for Appellant.

*Cleveland H. Baker*, Attorney-General, and *E. T. Patrick*, Deputy Attorney-General, for the State.

*Thomas E. Kepner,* for Appellant on petition for a rehearing.

By the Court, NORCROSS, J.:

This is an appeal from a judgment and from an order denying defendant's motion for a new trial. Defendant was convicted of murder in the second degree, upon which a sentence of fifty years' imprisonment was imposed. The indictment charged the defendant with the murder of one Sadie Isabel Heskett, at Rhyolite, in the county of Nye, on the 3d day of January, 1908. A former conviction of murder in the first degree was set aside by this court, and the case reported in 32 Nev. 70, 104 Pac. 223. The verdict upon the second trial was returned March 1, 1910. The case was not submitted to this court until January 21, 1914. Great delay in the submission of this case has been due in part to two reasons: Pending the appeal, the appellant escaped from the state prison, and was for some time at large before his capture and reincarceration. In December, 1912, Attorney-General Baker died, and Hon. Geo. B. Thatcher, who had represented the appellant in the court below, was appointed his successor. Attorney-General Thatcher thereupon withdrew as counsel for the defendant, but requested that time be given defendant to procure other counsel, and informed the court that in future the state would be represented by E. T. Patrick, Esq., who had been the deputy attorney-general under Mr. Baker, and had been continued in that office. The case, however, had been briefed by Mr. Thatcher and Attorney-General Baker prior to the death of the latter. Subsequently J. M. Frame, Esq., was entered as attorney for the defendant, and in January, 1914, filed a supplemental brief.

[1] A motion to dismiss the appeal, because of the escape of the appellant, was noticed by Attorney-General Baker, but was never formally presented to the court. We think this phase of the case should not be permitted to pass without notice. Some of the states have statutory

provisions providing for the dismissal of appeals in cases where the appellant escapes while the appeal is pending. Where there is no statutory provision on the subject, the courts have generally dismissed appeals, either conditionally or unconditionally, upon the escape of the appellant. The rule adopted by the California courts, under a practice act similar to the practice act in this state, is to dismiss appeals unless the appellant returns to custody within a time specified. (*People* v. *Redinger*, 55 Cal. 290, 36 Am. Rep. 32; *People* v. *Elkins*, 122 Cal. 654, 55 Pac. 599; *People* v. *Sitz*, 130 Pac. 858.) See, also, 12 Cyc. 879. Some similar rule ought to be, and doubtless will be, applied in future where the appellant escapes pending appeal.

[2–3] But two questions of alleged error have been presented in the briefs filed. Error is assigned in the admission by the court of a letter written by the deceased to the defendant about a month prior to the homicide. The letter reads as follows: "My dearest: I can't get out this afternoon and am in my room darling, quite miserable. I'm afraid love that isn't going to be settled. Now sweetheart I'm going to leave in the morning. I think it will be best. I'll go away and get settled. There's nothing here for me you know. I don't think they'd let me alone if I went to work. But I'll get everything in shape and will be able to send the money for the fine and enough for you to come on. Dearest you should try to brace up and trust me. I wouldn't have gone this far if I hadn't have intended to stick to you. It is the tho't of your unhappiness that makes it so hard for me. Now darling you'll be out at the most in a week. I'll send the money to you made out in Well's Fargo. You can indorse them and pay your fine and come right to me. It seems the best way. You can come perhaps on the next train after you get out. A week isn't long and I'll have the money then. Now darling the thing most sacred to me is our little Edith and as a guarantee of my faithfulness I'm sending her picture from my locket so that you can look at it and trust me and then

give it back when we meet again. Now dearest if I can get any other work when I get into a new town its no more tenderloin for mine. It doesn't pay. Then when you come you can go to work and all will be well. Sweetheart I would love to have you go with me but it seems impossible. I've tried so hard to get the money. But love, the impossible is the impossible and another name for money just now so have patience and be good. No matter what any one thinks of you I know you to be truly good. I know you have the most loyal heart that beats in human breast and most of all you are the only man in the world for me. Now sweetheart I'm not coming to see you; it is far too painful. I'll pray for you every night that the days may seem less long. I will go to sleep with your image in my heart. I will know you to be faithful to me and surely you can be satisfied for a few short days. The fine will be a little less then and I'll make it somehow. Don't think that I've been contented one minute you've been in there for I've been on the verge of collapse all the time; but I've got to brace up and that is all there is to it. When you get out I'll be as sick as I want to. When you get discouraged dearie think of that little piece of poetry 'Then let come what may, I have already had my day.' Surely we have been happy enough to make up for a few unpleasant days. The sun you know can't always shine. We must accept the sunny days with thankfulness and the rainy days as our due. I'm going to work down there and get you some kind of work and we'll be quite happy. Things could have been much worse love. I might have been in and that would be dreadful. I'm kissing little Edith's face darling and she will carry my kisses to you with a short good-bye. Surely she knows how closely she binds us together. Mona."

The proofs showed that at the time of the homicide, the appellant and decedent were living together in an adulterous relationship in the town of Rhyolite, and that prior to their going to Rhyolite had so lived in other

places.　Deceased was a proprietress of a dance hall, and the defendant a gambler by vocation.　The homicide occurred about the hour of 3:30 in the morning, and shortly after the return of the appellant to the house where the parties were living together.　The appellant was the sole surviving witness of the tragedy.　Three bullets were found to have entered the body of the deceased and two to have entered the body of the defendant.　One bullet entered the body of the deceased at the right shoulder, on the median line, and came out under the arm posterior to the median line, and had a course downward and slightly backward; another bullet entered between the shoulder-blade and the back-bone and went almost through the body; another bullet entered the back of the neck and had a downward course.　Upon the body of the defendant a bullet entered the left breast, passed downward and outward through the pectoral muscle for a distance of three or four inches, the point of exit being about one inch below the point of entrance. Another bullet entered the body of the defendant over the eighth rib, a half inch posterior to the median line, passed through muscular tissue, and had its exit over the twelfth rib an inch and a half posterior and two and one-half inches below the point of entrance.　It is proper to note that at the trial there was some contention between the prosecution and defense as to the point of entrance of the bullet which caused the wounds last described. Neither of the wounds of the defendant appear to have been regarded as serious.　Immediately, or shortly after the shooting, the defendant ran out of the house and down the street, dressed only in a union suit of under-clothing.　He was heard by the night officer to be saying in a loud voice, "I want to make a confession."

The officer testified that he said to him: "I have only a short time to live.　I want to make this confession. Norma shot me.　I shot Norma and then I shot myself. Norma was not to blame in this affair at all.　I shot Norma with soft-nosed bullets.　I was living with Norma.　I was

not married to her.    I want to make a confession to my
wife and relatives living in Colorado."    Defendant was
immediately thereafter taken to the office of Dr. Wilkin-
son, who dressed his wounds.    The defendant insisted on
a statement from the doctor as to the seriousness of his
wounds, and was informed by the doctor that he did not
consider them serious. · The doctor testified that shortly
thereafter the defendant said that ·Norma shot him and
offered the gun to ·him, wanting him to shoot her, and
that he refused to do it, and that she shot herself.    It
seems to have been the contention of the defense at the
trial that the defendant was so highly excited at the time
these statements were made that he was not responsible.

At the trial defendant admitted the killing, but set up
self-defense as a justification of his act.    In brief his tes-
timony was to the effect that he had informed defendant
that it was his intention to leave and return to Colorado;
that an altercation resulted between them, in which the
deceased shot the defendant twice; that defendant then
wrested the pistol from her, whereupon deceased started
for another part of the house where another revolver
was supposed to be; that the defendant then shot her,
believing that she was about to arm herself again and
make another deadly assault upon him.    As there was no
witness to the shooting, other than defendant, his version
of the affair was subject to be tested by all the physical
facts and such evidentiary facts or circumstances as
would reasonably tend to throw any light upon the
question.

The relationship and the degree of affection or regard
which the parties bore towards each other was a circum-
stance which the jury had a right to consider in con-
nection with the physical facts and other circumstances
surrounding the killing, as bearing upon the question of
the probability of the deceased or the defendant making
the assault.    When the defendant interposed self-defense
as a justification for his act in taking the life of deceased,
he charged the latter with being the assailant, and the
issue then shifted to the question whether deceased had

made an assault upon defendant with intent to take his life. This being the question, it was competent for the defense to have shown a feeling of hatred or ill-will upon the part of the deceased towards the defendant, if such were the fact. Upon the other hand, it was proper for the state to show the existence of feelings of love, affection, or regard upon the part of the deceased towards the defendant as a circumstance bearing upon the question of probability of the acts of deceased.

Wigmore says: "Statements before the act, asserting *malice* or *hatred*, are always received against an accused, except so far as the time of feeling is so remote as to make it irrelevant. Is there any reason why prior statements in favor of the accused—for example, of *good feeling* towards the injured party, or of *fear* of him as an aggressor—should not be equally admissible? Conduct offered as circumstantially evidential does not seem to be objected to. * * * To hold that every expression of hatred, malice, and bravado is to be received, while no expression of fear, good-will, friendship, or the like can be considered, is to exhibit ourselves the victims of a narrow whimsicality which might be expected in the tribunal of a Jeffreys, going down from London to Taunton, with his list of victims in his pocket, or on a bench 'condemning to order,' as Zola said of Dreyfus's military judges. * .* * There is no reason why a declaration of an existing state of mind, if it would be admissible against the accused, should also be admissible in his favor, except so far as the circumstances indicate plainly a motive to deceive." (Wigmore on Evidence, vol. 3, sec. 1732.)

In reference to the case of *Pettit* v. *State*, 135 Ind. 393, 34 N. E. 1118, Wharton's Criminal Evidence (10th ed.), vol. 2, sec. 904, says: "On the part of one accused of having killed his wife as a result of his loss of love and affection for her, and his infatuation for another woman, an affectionate letter written by the wife to the husband is relevant to disprove motive for the crime."

Is there not more reason why such a letter would have

been admissible, if the husband had set up self-defense and charged the deceased wife as being the assailant, to disprove motive on her part for attack upon her husband towards whom she entertained feelings of affection? We think there is. The court below did not err, we think, in admitting the letter in question.

[4] Error is assigned in the giving of the following instruction: "In civil cases the well-known rule is that the party sustaining the burden of proof is entitled to succeed in his action or defense if he supports his side by what is termed a 'preponderance of evidence'—that is, if the evidence adduced by him is of greater weight or probative value than that adduced by his opponent, so as to turn the scales of justice in his favor. But the charity of the law and its solicitude for the safety of the innocent are such that an artificial presumption of innocence attends a person accused of crime throughout every stage of the trial until it is overcome by the degree of proof hereafter stated. This presumption is in the nature of evidence in his favor. The strength of this presumption is not overcome by a mere preponderance of the evidence, nor by any weight of preponderating evidence, but it stands as the shield of the accused until it is overthrown by evidence possessing such a degree of probative force that it satisfied the minds of the jurors beyond a reasonable doubt that he is guilty of the crime charged. The usual formula in which this doctrine is expressed is that every man is presumed to be innocent until his guilt has been established beyond a reasonable doubt."

The foregoing is one of the nine instructions given upon the questions of presumption of innocence and reasonable doubt. It is contended that this instruction is an invasion of the province of the jury, in that it is a comment upon the weight to be given the presumption, and that it is fundamentally wrong as a statement of law upon the subject; that the court in the first instance apologizes for the existence of this rule of law, and then

depreciates it by telling the jury that it is only artificial. We are not cited to any specific authorities holding that an instruction substantially in the form of the one under consideration is erroneous, nor do we think an analysis of this instruction will support the objections raised against it. We are inclined to the view that the comparison of the rule in civil and criminal cases contained in the fore part of the instruction adds nothing to the value, and only opens the door to controversy. As a statement of law, however, it is not objectionable. The same may be said relative to that part of the instruction stating that the presumption is an artificial one, based on "the charity of the law and its solicitude for the safety of the innocent." The main objection to this instruction appears to be based on the use of the words "charity" and "artificial," particularly the latter. Our attention has not been called to any case where a similar instruction had been considered where the word "charity" had been used.

Similar expressions are to be found, however, in approved instructions, such as "The law in its humanity presumes," etc. (Brickwood-Sackett, Instructions, secs. 2639, 2644.) Even if we were to concede an inappropriate use of the word "charity" in the instruction, it is not for such trivial inadvertencies that judgments are reversed. The reference to the presumption as being artificial is not incorrect. The late work of Chamberlayne on the Modern Law of Evidence treats the presumption of innocence under the general heading of "Pseudo-Presumptions." Pseudo is defined as a prefix signifying false, counterfeit, pretended, or spurious. (Webster.) The author, in section 1172, says: "Few false presumptions of law have so wide a vogue or have created so intolerable a confusion in the law of evidence as the so-called 'presumption of innocence.' * * * A phraseology commonly employed in stating this pseudo-presumption of law is to the effect that in criminal cases a person accused of crime is presumed to be innocent

until proved to be guilty." While, as a general rule, it doubtless would be better for a court, in stating a rule of law in an instruction, not to accompany it with the reasons for its existence, or with phraseology that, however correct, might be misleading to the average juryman, nevertheless we can see nothing in this instruction that would warrant us in saying that the jury might have been misled by it. When the instruction is considered in connection with the other instructions given upon the subject, it is manifest that the defendant could not have been prejudiced by the instructions of the court on the law of presumption of innocence. See, also, Wigmore on Evidence, sec. 2511.

Judgment and order affirmed.

TALBOT, C. J.: I concur.

MCCARRAN, J., having been district attorney of Nye County during the first trial of the appellant, did not participate in the case.

[NOTE—Petition for a rehearing was filed March 25, 1915.]