## No. 11,903.

### OSBORN AND NOAKES *v.* THE PEOPLE.

Decided December 12, 1927. .Rehearing denied January 3, 1928.

Plaintiffs in error were convicted of first degree murder.

### *Affirmed.*

1. CRIMINAL LAW—*Defendants' Witnesses.* The provision of article 2, section 16 of the Constitution, that in criminal prosecutions the accused shall have the right to have process to compel the attendance of witnesses in his behalf, is mandatory.

2. *Defendants' Witnesses at State's Expense.* Application by a defendant in a criminal case for the procurement of witnesses at the expense of the people should be made at the earliest opportunity.

3. *Defendants' Witnesses at State's Expense.* In a prosecution for murder it is held, that if the court had discretion in the matter, it was not abused and there was no error in a refusal to summon an expert medical witness for defendant at the expense of the people, where a first application had been granted, and the application for the additional witness was not made until after the state had closed its case in chief.

4. *Defendants' Witnesses at State's Expense—Distance Limit.* In a criminal case, the court has discretion to summon witnesses for the defendant at the expense of the people only when they are within 100 miles of the place of trial, and in determining the distance it is to be measured, not in a direct line, but by the route that the witness is necessarily required to travel.

5. EVIDENCE—*Judicial Notice—Distance.* In determining the distance that a witness living in Denver would be required to travel to reach Hot Sulphur Springs, the place of trial, the court could take judicial notice that it was more than 100 miles by the route the witness would necessarily have to travel.

6. WITNESSES—*Expert—Fees.* There is no statute in Colorado providing fees for medical witnesses or alienists in excess of those allowed nonexpert witnesses.

7. CRIMINAL LAW—*Evidence—Confessions—Caution.* Where one accused of crime makes a confession to an officer, it is suggested that the proper caution, if any, to be given is, that his statement may be used against him.

A caution that it "may be used for or against him" does not require the rejection of the confession as evidence in Colorado.

8. *Evidence—Confessions.* The fact that the body of a murdered man and stolen property were found where indicated by the accused in a confession, is properly admissible in evidence even on the supposition that the confession was improperly obtained.

9. *Evidence—Confessions.* To be admissible in evidence a confession must be voluntary. The question of admissibility is for the court, not the jury, but having been admitted in evidence, it is for the jury to determine the weight to which it is entitled.

10. *Evidence—Confessions—Admissibility.* Where the court is in doubt whether a confession is voluntary or not, the evidence may be admitted, leaving to the jury to determine the weight to which it is entitled under all the circumstances.

11. APPEAL AND ERROR—*Fact Findings.* Findings of a trial court on conflicting evidence are conclusive on review.

12. CRIMINAL LAW—*Evidence—Confessions—Admissibility.* The use of a trick or fraud, however reprehensible, does not of itself make necessary the exclusion of a confession obtained by its means. Such matters should, however, be considered in connection with the other evidence in determining whether the confession was voluntary.

13. *Evidence—Confession—Admissibility.* In determining the admissibility in evidence of a confession, each case depends upon its particular circumstances. Whether confinement of accused in a dark, empty cell from 11 o'clock in the morning to between 3 and 5 o'clock in the afternoon of the same day, under the conditions described, caused accused to make a confession, and whether it constituted a sufficient inducement to persuade him to confess falsely, was for the determination of the trial court.

14. *Evidence—Confession—Involuntary.* To make a confession involuntary because of promises or threats, they must have induced the confession; there must be a connection between the promises or threats and the confession, and the latter must have been caused, prompted or produced by the former.

15. *Evidence—Confession—Admissibility.* The admissibility of a confession in evidence is largely within the discretion of the trial court, and on review its ruling thereon will not be disturbed unless there has been a clear abuse of that discretion.

*Error to the District Court of Grand County, Hon. Charles E. Herrick, Judge.*

Mr. ROBERT EMMET LEE, Mr. EDWARD L. COMPTON, for plaintiffs in error.

Mr. WILLIAM L. BOATRIGHT, Attorney General, Mr. WILLIAM W. GAUNT, Assistant, for the people.

*En Banc.*

MR. JUSTICE BUTLER delivered the opinion of the court.

THE plaintiffs in error, Arthur Osborn and Jasper Raymond Noakes, were found guilty of murder in the first degree and sentenced to death.

Fred N. Selak resided in a cabin near Grand Lake, in Grand county. On July 25, 1926, Nair, his employee, sought him at his cabin, but did not find him. The condition of the cabin aroused the suspicions of Nair, who reported to the sheriff that Selak was missing. A search was begun. Osborn and Noakes were taken into custody by the sheriff. Osborn was 22 years old at the time; Noakes, 20. They are cousins, and lived with Osborn's father in the neighborhood of Selak's cabin. Noakes and Osborn were brought to Denver. Both of them confessed. The trial was held in Hot Sulphur Springs March 7, 8, and 9, 1927. At 1:30 p. m. on the 7th, before the jury was selected, the defendants filed a joint sworn application, stating that their defense would be "insanity or mental irresponsibility," asking to be permitted to defend as poor persons, and requesting the court to order process for the attendance of "some competent alienist to be designated by the court." The court granted the application, and ordered that Dr. Howell T. Pershing, of Denver, be called at the expense of the people, at $100 per day and expenses, as a witness for the defendants. A recess was taken until the next morn-

ing to enable Dr. Pershing to be present during the taking of the testimony. At the conclusion of the people's case, at 4:27 p. m. on the 8th, the court took a recess to 9 a. m. the next day to enable the defendants' attorneys to confer with Dr. Pershing. The next morning, having been advised by the doctor that in his opinion the defendants were not insane, that they knew the difference between right and wrong, and had the intellectual capacity to choose between them, and to do the right and resist the wrong, the defendants applied for an order for the attendance of Dr. Leo V. Tepley, of Denver, as an expert witness in their behalf on the question of insanity. This application was denied.

Three assignments of error are argued: (1) The court's refusal to order, at the expense of the people, the attendance of Dr. Tepley as an expert witness in behalf of the defendants; (2) the alleged failure of the people's witnesses to identify the defendants; and (3) the admission of the confessions.

1. Years ago, in England, defendants in criminal cases were not, even at their own expense, entitled to process to compel the attendance of witnesses in their behalf. It was because of this injustice, and to prevent a recurrence of the practice, that our bill of rights (Const. art. 2, sec. 16) provides that in criminal prosecutions, the accused "shall" have the right to have process to compel the attendance of witnesses in his behalf. That provision is mandatory. But to have such process at the expense of the public, is another matter. Section 7121, C. L., provides: "Whenever any person, indicted in a court of the state of Colorado, shall make affidavit setting forth that there are witnesses whose evidence is material to his defense; that he cannot proceed to trial without them; that they are within the judicial district in which the court is held, or within one hundred miles of the place of trial; and that he is not possessed of sufficient means and is actually unable to pay the fees of such witnesses, the court in term, or the judge thereof in vaca-

tion, if it appears to said court or the judge thereof that the evidence of such witnesses would be material in the trial of the cause, *may* order that such witnesses be subpoenaed, if found within the limits aforesaid. In such case the costs incurred by the process and the fees of the witnesses shall be paid in the same manner that similar costs and fees are paid in case of witnesses subpoenaed in behalf of the people."

The statute says "may" order, not "shall" order. In *Nesteroff v. People,* 71 Colo. 208, 210, 205 Pac. 531, 532, Mr. Justice Burke, speaking for the court, said: "Counsel for defendant admit that the issuance of the order as to this witness rested in the sound discretion of the court. The record clearly shows that discretion to have been properly exercised." In a note to *Pittman v. State,* 51 Fla. 94, 41 So. 385, reported in 8 L. R. A. (N. S.) at page 509, the annotator says: "It seems to be well settled that the constitutional right of defendant in a criminal case to compulsory process to procure the attendance of witnesses in his behalf does not include the right of having them brought into court at public expense"; citing Bishop, New Crim. Proc. sec. 959b; 3 Rice Ev. sec. 188, and a number of cases.

Applications for the procurement of witnesses in behalf of defendants, at the cost of the people, should be made at the earliest opportunity, and not withheld until the case is actually called for trial. *Pittman v. State,* 51 Fla. 94, 41 So. 385, 8 L. R. A. (N. S.) 509. See also *State v. Thornton,* 49 La. Ann. 1007, 22 So. 315. In the present case, the defendants made no application whatever until several months after their arrest, and just before the jury was selected. The first application was granted, and Dr. Pershing was called at the expense of the people to examine the defendants and testify in their behalf. Not until after the state closed its case did the defendants make the application, now in question, to have Dr. Tepley summoned. Assuming that in the present case the court had discretion in the matter, it

did not abuse that discretion in refusing to grant the application. However, the court has such discretion only when the witness sought to be subpoenaed is within 100 miles of the place of trial. If the witness is beyond that distance, the court has no power to order the witness to be subpoenaed at the expense of the people. In the application, sworn to by both defendants, they sought to procure the attendance of Dr. Leo V. Tepley, "of Denver, Colorado." In support of the application, Mr. Lee, one of the attorneys for the defendants, testified to there being at that time "no other means of transportation from Denver to Hot Sulphur Springs, except by way of the railroad, the automobile roads being all closed." The court took judicial notice that the distance between Denver and Hot Sulphur Springs by railroad is over 100 miles. It was not disputed then, and it is not disputed now, that the distance by railroad is over 100 miles. It is claimed, however, that the distance should be measured by a direct line between the two places, which is less than 100 miles. In determining how the distance is to be measured, regard must be had to the purpose of the statute. Section 7907, C. L., provides that witnesses shall be allowed mileage fees of 15 cents per mile "for each mile actually and necessarily traveled in going from his place of residence to place named in subpoena." It seems clear that the purpose that the legislature had in providing a limitation of 100 miles (section 7121, supra) was to limit the amount of expense for mileage, when a defendant obtains compulsory process at the expense of the people. Such expense is determined by the number of miles necessarily to be traveled by the witness. It follows that the distance is to be measured, not in a direct line, but by the route that the witness is necessarily required to travel. In *Jennings v. Menaugh*, 118 Fed. 612, the circuit court held that whether a witness lives at a greater distance than 100 miles from the place of holding court, so as to authorize the taking of his deposition, is to be determined by taking

the ordinary, usual, and shortest route of public travel, and not by a mathematically straight line between the place of residence and the place of trial. See also *In re Foster,* 44 Vt. 570; *Smith v. Ingraham,* 7 Cow. (N. Y.) 419. In *State, ex rel. v. Mostad,* 34 N. D. 330, 158 N. W. 349, under a statute with reference to school accommodations "within a distance of 2½ miles of" the homes of the children, it was held that the distance is to be measured by the roads that are actually opened and passable. In the present case, there was no other means of transportation except by railroad, the automobile roads being all closed.

There was no evidence of the distance between Denver and Hot Sulphur Springs by railroad, and the contention is made that the court cannot take judicial notice of the distance. *McConnell v. Schultz,* 23 Colo. App. 194, 128 Pac. 876, is cited in support of the contention. In that case, Mr. Justice King said that the court is "not required" to take judicial notice of "the distance from Cripple Creek to Alamosa by the sinuous route between those two places." That is true. "There are numerous topics, near the line of doubt in their feature of notoriety, of which the court may, but not must, take notice." 5 Wigmore Ev. (2d Ed.) sec. 2568. In *Johnson v. Atlantic C. L. Railroad Company,* 140 N. C. 582, 53 S. E. 362, the court took judicial notice of the distance by railroad between Warsaw and Clinton, N. C. In *Mutual Ben. L. Ins. Co. v. Robison,* 58 Fed. 723, 7 C. C. A. 444, 22 L. R. A. 325, the court took judicial notice that the distance between Dubuque, Iowa, and Asheville, N. C., exceeds 100 miles. In *Pettit v. State,* 135 Ind. 393, 412, 34 N. E. 1118, the court took judicial notice that the distance between East Portland, Oregon, and Crawfordsville, Indiana, is 2398 miles. In *Carroll v. U. S.,* 267 U. S. 132, 45 Sup. Ct. 280, 69 L. Ed. 543, 39 A. L. R. 790, the court took judicial notice of the distance between Grand Rapids and Detroit, Michigan. In *Gibson v. Austin,* 23 Colo. App. 220, 128 Pac. 859, it was held that

courts will take judicial notice of the location of counties, cities, and towns of the state, and that particular places are connected by railways. The railroad between Denver and Hot Sulphur Springs has been in existence for many years, and the distance between the two places by railroad is a matter of common notoriety in this state. 5 Wigmore Ev. sec. 2571.

As Denver is more than 100 miles from the place of trial, measured by the only route available for travel at the time of the application for a subpoena and at the time of the trial, the court had no power to order process to compel the attendance of Dr. Tepley as a witness in behalf of the defendants at the expense of the people.

In obtaining the order summoning Dr. Pershing from Denver at public expense, the defendants obtained more than they were entitled to under the law; not only because he was summoned from a distance greater than 100 miles, but also because the defendants were not entitled to have an expert witness summoned at an expense to the public greater than the statutory witness fee and mileage. There is no statute providing for fees of medical witnesses or alienists in excess of those allowed non-expert witnesses. *Board of County Commissioners of Larimer County v. Lee,* 3 Colo. App. 177, 32 Pac. 841.

Dr. Pershing examined the defendants and their parents, and arrived at the conclusion that neither of the defendants was insane. The defendants' counsel, Mr. Lee, in his testimony, said that Dr. Pershing "is a man of great learning and high repute and undoubted integrity, fairness and ability." These qualities were enlisted in behalf of the defendants at the expense of the public. The court did not err in refusing to order the attendance of Dr. Tepley also.

2. The defendants were sufficiently identified. These defendants were the identical persons taken into custody, charged with the murder of Selak, and they have been in custody ever since. They were the ones who made the confessions. It is not contended that they are not. The

record recites that they were present in court during the trial; and, under the practice, they must have been. It is the practice for those on trial for murder to sit next to or close to their counsel at the counsel table within the bar, and it is not suggested that the defendants in this case did not do so. They must have been observed by the jury. That the jurors knew they were the defendants, is shown by the fact that the jurors desired to know "which is Noakes and which is Osborn." Counsel say that the jurors should have been given the information they sought. The jurors made the request after they had retired to deliberate. Thereupon the court said, "If there is no objection, I will have the defendants brought in and have them identified." But counsel for the defendants objected to this being done, and the court remarked: "Very well; we will not do it then." It is suggested that if the jurors had known which was Noakes and which was Osborn, they might have imposed a lighter penalty upon one than upon the other. But the part that each took in the homicide was clearly shown by the evidence, and the jurors were fully advised thereof. In denying the motion for a new trial, the court said, with reference to this matter: "The court desires to make a statement as to the lack of identification which is being pressed at this time. It is the very distinct recollection of the court that Mr. Lee questioned one of the jurors, in the presence of the court after agreement and after the jury had been discharged, at which questioning informally in the Judge's chambers, this juror, in the presence of at least one other juror, made the statement that the jury had taken a vote and secret ballot to be sure whether or not they each and every one knew and understood which was Osborn and which was Noakes, and that they agreed absolutely on the first ballot as to which was which, and that they thoroughly understood which was which before they balloted as to their guilt or innocence; and this having come to the attention of the court, the court is convinced that no prejudicial error occurred

from that source." This assignment of error is without merit.

3. It is said that the confessions of the defendants were not voluntary, and therefore should not have been admitted. The circumstances attending the confession of Noakes are substantially as follows: Noakes was brought to Denver on Saturday, August 14, and placed in an ordinary cell in the jail. On Monday, the 16th, shortly before noon (around 10 or 11 o'clock), he was brought to the office of the Denver chief of police (Reed), and on being questioned by the chief for 10 or 15 minutes, denied all connection with Selak's disappearance. Under order of the chief, he was then placed in solitary confinement in a cell, "not any different from any other cell, except it is dark." It had no bunk in it. "There was nothing in there; the four walls, the floor and the ceiling, and dark." The chief testified that he placed Noakes in solitary confinement because he did not want anyone to talk to him. In the afternoon Noakes was taken about four times to the chief's office and questioned, each of the first three interviews lasting about a half hour or less. Chief Reed testified that prior to Noakes' making the confession (marked Exhibit J), he cautioned Noakes that whatever "he may state may be used for or against him when the case came to trial." We suggest that the proper caution to give, when it is given at all, is not that the statement will or may be used *"for or* against" the accused, but (substantially) that "it may be used against him." The use of the former, however, does not require the rejection of the confession, except in some states. For example, in Texas the form of the caution is prescribed by statute, and a substantial departure from that form excludes the confession. 2 Wigmore Ev. sec. 831, note; 16 C. J. p. 724. Chief Reed also testified that "there were no threats or inducements of any kind," to his knowledge, and that at the morning interview he talked to Noakes about the crime. "I accused him of having committed it and told him that I could prove it;

did not tell him, and nobody in my presence told him, that he would hang for it if he did not make a statement." The first interview after lunch was practically the same as the one in the morning. "I was not endeavoring to get him to confess to the guilt. I was endeavoring to get the boy to tell the truth. I did not tell him he had better tell the truth, and nobody in my presence told him that. I did not tell him he had better admit his connection with the fact.  *  *  *  I did not mention any part of the case at all; told him it was always better to tell the truth. I told him, and kept telling him, that I knew it was the truth that he participated in this hanging and that he was guilty; that I knew it and would prove it on him. Then I kept advising him to tell the truth.·  *  *  *  I advised him probably two or three times that day to tell the truth—each time he was up there.  *  *  *  Q. Did you tell him [the officer] on any of those occasions to take him back and keep him there until he talked? A. No; he did not know. I did not ask him every time I brought him out whether he was ready to talk yet or not. I am quite sure patrolman Cole and Hadley were present on each of these occasions." The conversation at the second interview in the afternoon "was practically the same as on the former occasions." At that interview he denied practically everything. "I told him I wanted him to make a statement—wanted him to tell the truth." Noakes answered some of the questions asked by the chief. "I did not accept those answers. I told him that I knew that they were not true, and I wanted him to tell the truth." At the third interview in the afternoon the chief questioned Noakes along the same line as at the previous interviews and sent him back again. "He was not gone but a short time until detective Cole came back and said he [Noakes] wanted to tell me his story in the office." Noakes was brought back, and thereupon made his statement, in answer to questions, in the presence of Chief Reed, officer Cole, Richter (stenographer), Coffee and two newspaper

reporters, O'Brien and Geiger. The stenographer took down what was said, and typewrote it. The chief did not tell Noakes that he would do anything in his behalf, or that Noakes could not or would not hang, if he pleaded guilty.

With reference to the Noakes confession, detective Cole testified: "I went down and got him [Noakes] and came up to the chief's office, and the chief talked to him probably 15 minutes. Took him back down and got down to the room where they keep the automobiles and talked to Noakes. I asked him if he did not want to tell the chief about what happened. He studied for a little bit; dropped his head. I asked him how many was in on that job, and he said there was two. I asked him who they were and he said, 'Art and myself.' I asked him to come back up and tell the chief and he said, 'Yes.' We went back up and he sat down and detailed that matter. The stenographer was called in then. Before he made the statement before the stenographer, Reed told him that anything he said could be used for or against him at the trial—told him to make his own voluntary statement."

Geiger, a newspaper reporter, testified that he was present when the statement was made by Noakes to the chief of police and other officers in Denver; that he heard the conversation preliminary to the statement; that the chief asked Noakes if he had anything to say, and told him that anything he might say might be used for or against him, and it was a voluntary statement; that the witness was present when Noakes made the first statement on the 16th; that Noakes "acted ordinarily"; that he was sitting in there smoking; that Noakes "didn't seem awfully excited."

O'Brien, another newspaper man, testified that he was present when the statement was made by Noakes before the stenographer in the chief's office in Denver; that he heard the conversation preliminary to this statement;

that the chief warned Noakes that anything he may say might be used for or against him at the trial.

Chief Reed's secretary, Richter, testified that he took down in shorthand and transcribed Noakes' statement; that he read the statement over to Noakes after it was transcribed; that the chief handed it to Noakes, and asked him to read it, and that Noakes said it was correct; that Reed talked with Noakes about signing it—asked him if he wanted to sign it; that Noakes said that he did not care to at that time; that Exhibit J is a correct transcription of Noakes' statement; that it took Noakes about 10 minutes to read it.

The testimony of Noakes, given before the judge in the absence of the jury, is as follows:

"I am one of the defendants in this case. A statement was taken from me by a stenographer in the office of the Chief of Police of the City and County of Denver, along about the 16th of August last, on a Monday, as I recall. At that time I had been in the tank in the city jail since about Saturday noon—Saturday morning. Just in separate cells. I first saw Chief Reed Monday morning. I did not talk to anybody between Saturday morning, when I was taken to the city jail, and Monday morning. I was in there alone. I did not talk to the other prisoners. Then I was taken out Monday morning to Chief Reed's office and put in the same cell when I was taken back. After my first conversation with Chief Reed I was taken to the dark cell, what they called the 'hole.' He did not say why I was being put in the 'hole.' He did say that he was keeping me there until I talked. I was brought out again into the Chief's office and then taken back to the dark cell several times that day. From the time I was put in the dark cell Monday morning until I made the statement I had nothing to eat or drink. I had no water. I asked some of the fellows down there for water. I did not get any water. I don't know exactly the time of the evening when I made the statement, it was getting pretty late though. It was after dark. I had been inter-

viewed by the Chief, that is, when I made the statement, five or six times, maybe—well, I couldn't say for sure, it was several times. I had not admitted any connection with this hanging up until the last time when my statement was taken down by the stenographer. I denied all such connection. Q. What statement was made to you before your statement was taken with regard to any promise of benefit you may receive if you made the statement, or any injury that you might suffer if you did not? A. Chief Reed said if I plead guilty they wouldn't hang me and if I plead guilty that he would see that they did not, and he said if I did not, why, they were going to hang me. Reed and Cole and I think Mr. Hadley, I don't recall—there was several of them present at the time. Before I made the statement Chief of Police told me that they had a confession from Osborn and he said we done it. That was on the 16th. It was two or three days I believe before I first saw Osborn in the Chief's office. After the statement was taken down by the Chief's stenographer, Mr. Richter, there was a typewritten document prepared which purported to be my statement and handed to me to read, which I did. The Chief of Police asked me whether it was correct or not. I don't think I gave him any answer. He asked me if I wanted to sign the confession and I told him no, that I did not, and— it was handed to me for signature every time they talked to me out there—several times—I don't recall; several times they had taken me out there and asked me to sign it, and they handed me a pen to sign it with every time they asked me to sign. I refused to sign in every case. After I made the statement to the Chief's stenographer and he had taken it down in shorthand they had me taken to the hospital ward. I did get something to eat after the confession. I was without anything to eat or drink from in the morning until some time that night and I was in the Chief's office several times that day. I don't think I told him or made any complaint about not having anything to eat down there. I asked some one in the

jail I saw for some water and they said they would get it, but they did not bring it to me, but I did not tell the Chief about it at all. The Chief of Police told me that if I would confess that they could not hang me for it, that is correct. I don't remember all of them that were present when that was stated by the Chief of Police, but I think Hadley and Cole; there might have been some more. That was stated to me several times, most every time I was taken out and given—that was before I made that statement. After that statement was made and after it had been written out on the typewriter, I read it over. Q. And it contained just what you so stated to the stenographer didn't it? A. Well, I would not say for sure whether all of it was or not. I could not say for sure that it seemed to me to be a correct statement of what I had told the stenographer. * * * Q. Mr. Noakes, as a matter of fact didn't the Chief of Police grant you every request practically that you asked? If you asked him for a cigarette or to have a shave didn't he have it done for you? A. Well, he gave me a cigarette; a shave, I did not ask him for that. Q. Whatever you asked for you got it from the Chief of Police? A. Well, I think I did in the way of smoking.''

Cole, referring to Noakes' testimony that the chief (Reed) told him that if Noakes would plead guilty they would not hang him, testified that nothing of that kind occurred in Cole's presence.

Referring to the same matter, Hadley testified that he never heard Reed make that statement; never heard any such thing as that mentioned at any time.

Chief Reed denied having said it.

Noakes' confession (Exhibit J) is in the form of questions and answers. Condensed to narrative form, it is as follows:

I want to make this statement and tell all about it voluntarily. I understand that whatever I say will be used for or against me. My full name is Jasper Raymond Noakes. I live with my uncle at Grand Lake. Have

lived in that neighborhood three years. I am 21 years old. Worked for my uncle. "I done teaming and worked in the wood logging." Knew Fred M. Selak. Was not very well acquainted with him; just knew him "when I seen him." Don't remember just what day it was when I saw him last. It was "when we taken him up there." By "we" I mean Art Osborn. Think that was July 21st; that was when we took him up. Saw him at the cabin at night, around 8 or 9 o'clock—around dark some time. Art Osborn and I took him up. Went down there and took him up there in the hills and hung him to a tree with a halter rope. Left him hang. So far as I know he is still hanging to the tree up there. When Art and I first went in the cabin we made him put his hands up—that is Art made him do so. Art pointed an automatic pistol at him. Couldn't say what caliber. The pistol belonged to Marion Reese, the fellow that worked up there for Lon Osborn, my uncle, Art Osborn's father. Miller has the pistol up there. Art told the old man "to put them up." Don't remember whether he [Selak] did or not. Then Art and I tied his hands behind him, and looked through the cabin; didn't see anything; didn't find anything, only what he had on him. Took him up in the hills and then came back to the cabin. Then we searched the house and found around $75.00 in a little cloth sack under the floor. "We taken it with us." We got around $40.00 or $50.00. I got half; that was the bargain. The understanding between me and Art was "to go halvers." Don't remember what else Art and I took; there was a suit of clothes, and I think two coyote hides, some underwear and some watches. "Q. How about the shot gun? A. And the shot gun. Q. Ten gauge shot gun? A. Yes, that isn't the gun that was up at the cabin. Q. What did you do with the shot gun? A. I don't know. Q. Know what the other stuff was? A. Two watches, some underwear and a looking glass." The part I know about was on Selak's property; we found it there. Am willing to go up with the boys

and find this stuff and the old man. "Q. Did you and Gregg find the body when you went up the canyon? A. We intended to go over Monarch Canyon; we didn't get that far." We did not make any effort to go up where the old man was hanging. The old man did not fight; "I think the only reason, he thought he didn't have a chance." At first he didn't have much to say; he told us where this money was. We didn't find anything only what he had in his pockets. We did not tell him what we were going to do before we found the money. I don't know whether Art told him what he was going to do or not; we just put the rope on him and strung him up. All three of us walked from the cabin to the place we hung him—one-half or three-quarters of a mile away. Art climbed up the tree taking the rope. When Art did that all the old man said was, "he didn't see any use in it"—I don't remember what it was he said. Art asked if he remembered when he told him "not to start anything." What he meant by that was on the other deal—the deal over the fence; Selak had him arrested. After we got the rope over the limb, I pulled him up just off the ground and tied the rope to the tree and let him hang, and so far as I know he is still hanging there. He was really taken out and hanged because of the trouble he had over this fence. I told Art I didn't think he ought to do that and I told him not to, and he said "he done him dirt." Part of the money I spent at these different places was part of the money I got—my share that we got out of the cabin. That is the money I spent at Pine Cone and Granby; didn't spend as much money at Pine Cone as I said. Spent $3.00 or $4.00 and that's all I remember. "Q. You have made this statement of your own accord? A. Yes, sir."

Immediately after Noakes made this confession, chief of police Reed, together with Cole, Hadley, O'Brien and Geiger, went by automobile to Hot Sulphur Springs, arriving between 10 and 11:30 p. m. Reed questioned Osborn in the sheriff's house for a few minutes. Reed

testified that he did not tell Osborn, nor did anybody tell him in Reed's presence, that if he confessed he could not be hanged for the crime. Reed did not tell him he was going to hang, or that they were going to lynch him; did not tell him there were threats of that kind; no one told him that in Reed's presence. Reed questioned Osborn in the kitchen. Osborn talked very little at all, and Reed said, "Son if you maintain your present attitude, you will probably get your neck cracked." Osborn just answered in monosyllables. Before he would answer any questions at all, they got him into the car with the intention of acquainting him with the statement that Noakes had made. "There were no statements made to him in the way of promises, threats, or anything of that kind." After that Osborn was placed in the automobile, and they started for Denver. Osborn sat in the rear. Not much was said directly to Osborn. The others conversed among themselves about the case. Just before they reached the forks of the road, where one road goes to Denver and the other to Grand Lake, Osborn said: "Well, I guess you fellows know what you are talking about, all right. I might as well tell you, I took the old son-of-a-bitch out and strung him up." He then told in great detail how they had taken Selak out and "hung him to a tree." There had been no promises or threats or anything of that kind, Reed testified. Cole testified that just before Osborn made the statement, Cole told Osborn that if he wanted to tell the truth "we would not have to come back tomorrow." Osborn stated that he had buried the shot gun, clothes and stuff about 2 miles this side of Grand Lake, and promised to show the place, and Reed found the clothes, the shot gun and the rifle at the place indicated by Osborn. He also attempted to show where Selak's body was, but at 2 o'clock in the morning the search was abandoned because of the darkness, and Osborn was taken to Denver. Later that morning the body was found where Osborn said it was.

On August 19 Osborn made a confession (Exhibit K) in the chief's office. It was taken down in shorthand and

was typewritten by Richter, was read by Osborn, and was declared by him to be correct. The next day Osborn made another confession (Exhibit L) in the chief's office. This also was typewritten, was read by Osborn, and was declared by him to be correct. He did not sign either "K" or "L." Osborn made his statement (Exhibit K) in the presence of Noakes. Before making the statement, Osborn was cautioned that whatever he might say may be used for or against him. Later Osborn and Noakes were brought to the chief's office and questioned, "and each of them [orally] verified the statement of the other." Altering the form of Osborn's confessions from questions and answers to narrative form, they are as follows:

My full name is Arthur Alonzo Osborn. Live at Grand Lake. I understand that whatever I say in this statement may be used for or against me when the case comes to trial, and with that understanding I am willing to make a voluntary statement of the trouble I had with Mr. Selak, and the events leading up to the hanging.

At this place Osborn told about some trouble that he and his family had with Selak over the latter's building a fence across a road, thereby preventing the Osborns from hauling wood. The Osborns tore down the fence and were arrested and fined for doing so. "Q. How did you decide to get rid of him? A. Well, on the same grounds as the trouble and threats he made down there and everything." Noakes and I never talked much at all about it. Ray and I decided to go down and get the old man the same evening we went down. We never had much to say about it going down. We left home about 7 o'clock that evening—something like that—in my car; got the mail and maybe went up to the pool hall for a little while. Left Grand Lake about 8 o'clock. Went close down to his ranch, about a mile from the house. We left the car there and walked down to the house. Got to the cabin about 8:30—something like that. Don't think the door was closed. Selak was sitting by

the table. I think we knocked at the door. He opened the door and let us in. He said, "Hello!" I think it was something like that. I think I told him to throw up his hands; I had a gun in my hand; don't know whether I pointed it at him or not. He then said "all right," and threw up his hands. Ray was standing there. Did not tie his hands before searching him. Don't know whether Ray had a gun in his hand or not. Ray had a gun with him but I don't know whether he held it on him. After searching him, I tied him. Did not search the cabin at that time. Took him away from the cabin. He did not protest. Did not tell him what we were going to do to him. Did not have a rope around his neck at that time; just took him away from the cabin, straight out to where he was found. "Q. Have any conversation with him there before you hung him up? A. No, mighty few words said there." I was "kinda sore" the way he came down upon our land and threatened us the way he did. I climbed the tree and put the rope over the limb. When I started to climb the tree, he said: "That's kinda awful, boys"—something like that; and I told him who I was. "Q. Didn't he know who you was up until that time? A. Said he never—I don't know." When I told him who I was he never had anything to say then at all. I asked him if he remembered that day he was down on the place there. He never answered, never said anything more after I told him who I was. He said he had some money under the floor in the cabin. "Q. Say you could have it, if you let him go? A. I don't remember how he did take it." After I put the rope over the limb, I stayed up there till I tied it. My cousin give him a boost and I pulled. I tied the rope to the tree and tied him up there; then we went straight back to the cabin. I got the money from under the floor—$60.00 or $70.00; something like that. I divided the money with my cousin before we left the cabin. Did not divide the other stuff at the cabin. Never did divide it. "Q. That is all the stuff out of the cabin you put in the car?

A. We did." We went with it towards home. Did not have any of the stuff in the car when we got home. Got home between 1 o'clock—between 12 and 1 o'clock. Never said anything to anybody about what we had done. There wasn't anybody who knew about it. To the best of my knowledge that is the absolute truth of the whole business. When my cousin and I went to the cabin we had handkerchiefs around our faces. He did not have any idea who it was until I told him just before hanging him. "Q. Did you talk to anybody about the disappearance of Selak afterwards? A. No, not much." Had never borrowed any money from Selak before hanging him. Had no business dealings with him except over the old stage road. "Q. You read Ray Noakes' statement the other day. Would you say it is correct except what you have said about the automobile? A. I think, I don't remember all of it now. Q. You have made this statement of your own accord? A. Yes."

Confession of August 20: The statement made by him August 19 was handed to him and read by him. "Q. Is that correct, Arthur? A. Yes." We hung the old man up Wednesday night; do not remember the date. This is the gun I had. It was the property of Mr. Reese. This other gun belongs to Noakes. Think he had it the night we went down there. Referring to the photograph taken when Selak's body was discovered, Osborn said that it doesn't look much like him right there. He was dressed something similar to that when we hung him up. Don't remember whether he had a coat on when we hung him up.

It has been truly said, "There is no branch of the law of evidence in such inextricable confusion as that relative to confessions." *State v. Patterson*, 73 Mo. 695, 705. Chamberlayne (2 Modern Law of Evidence, sec. 1472) says: "The difficulty with regard to the matter is, in large measure due to the fact that an attempt is being made in this connection, on certain alleged grounds of public policy, rigidly to maintain rules of procedure,

as matters of substantive law, which are hard to sustain
in point of reason. Just here has been, as it were, a fierce
struggle in the law of evidence between the formalism
of the past and the rationalism of the future.''

Tracing the history of the law's use of confessions,
Professor Wigmore (Ev., sec. 817, et seq.) notes several
distinct stages. In the earlier usage, by confession was
meant a plea of guilty. Up to the middle of the 17th
century the use of torture to extract confessions was
common, and the confessions thus extracted were used
in evidence. ''In 1783 * * * the modern rule re-
ceived a full and clear expression, and confessions not
entitled to credit because of the promises or the threats
by which they had been obtained were declared inad-
missible in evidence. * * * At this stage, then, the
doctrine is a perfectly rational one. Confessions appar-
ently untrustworthy as affirmation of guilt are excluded.''
Id. During the first half of the 19th century, ''there was
a general suspicion of all confessions, a prejudice against
them as such, and an inclination to repudiate them upon
the slightest pretext.'' Id. Some of the decisions went
to absurd lengths in excluding confessions. In this situ-
ation, Baron Parke, in *Regina v. Baldry,* 2 Den. Crown
Cases, 428, 443, said, ''I confess that I cannot look at
the decisions without some shame when I consider what
objections have prevailed to prevent the reception of
confessions in evidence; and I agree with the observation
of Mr. Pitt Taylor, that the rule has been extended quite
too far, and that justice and common sense have too
frequently been sacrificed at the shrine of mercy.'' In
the same case, Mr. Justice Earle said, ''I am much in-
clined to agree wth Mr. Pitt Taylor; and according to
my judgment, in many cases where confessions have
been excluded, justice and common sense have been sac-
rificed, not at the shrine of mercy, but at the shrine of
guilt.'' And in *Queen v. Johnston,* 15 Ir. C. L. 60, 85,
Hayes, J., referred to such cases as ''an exhibition of
morbid sensibility towards criminals.'' A variety of

circumstances contributed to bring about such rulings. Professor Wigmore (Ev., sec. 865) believes that the social conditions in England in the 18th century and in the early part of the 19th century—the deference shown by the so-called "lower" classes toward those in authority, and the great influence exercised by the latter over the former—had much to do with the exclusion of confessions induced by the latter. So, also, the fact that the accused did not have the full benefit of counsel at the trial, could not testify in his own behalf, and had no right to appeal, influenced the judges to "restore the balance by excluding confessions upon every available pretext." "In view of these considerations," says Professor Wigmore (Ev., sec. 865), "it is easy to see why the law of confessions came to develop what seem to us, in another community and in other times, absurd and dangerous sentimentalities, and why there is no necessity whatever for our retention of the distortions and irrational excrescences which, as handed down to us in the English rulings of the early 1800s, have served to obscure the correct and entirely rational principle of exclusion applicable to confessions."

Speaking of confessions, which in the early days in England meant pleas of guilty, Chamberlayne (Mod. Law of Evidence, sec. 1617) observes, "In view of the severity of the penal code then in force, the disproportionate punishment frequently awarded for comparatively unimportant offences and the disabilities under which the accused labored, it seemed but just that before the judge should allow a prisoner, undefended by counsel, without the aid of witnesses, and hurriedly tried, often with almost indecent haste, to foreclose his last chance of escape by plea of guilty, he should make sure that the act was a deliberate one made with full knowledge of its consequences." Those early rulings, made under the conditions above described, have been followed by some of the courts of this country. Eminent judges and law writers have earnestly protested against blindly and

unreasoningly following those early rulings. Courts that years ago committed themselves to such extreme doctrines are loath to retrace their steps; and so, even in recent times, we find decisions that it is difficult, if not impossible, to reconcile with reason. Some of the rigid exclusionary rules of evidence are relics of the day when no defendant in a criminal case and no party to a civil suit could testify. The process of reasoning, apparently, was something like this: Our knowledge of human nature leads us to believe that many defendants in criminal cases and some parties to civil suits would, if permitted to testify, swear falsely because of their interest in the outcome; therefore, to prevent perjury in some cases, we will exclude from the witness stand defendants in all criminal cases and parties to all civil suits, although we know, and everybody else knows, that some persons who chance to be accused of crime, and many parties to civil suits, would not for any consideration, consciously depart a hair's breadth from the truth. Some of the early rulings seem to be due to a profound distrust of the intelligence of jurors—a belief that they either lack intelligence, or will not use it. It will not do to act upon that assumption in these days of compulsory education and wide dissemination of knowledge. Professor Wigmore says (Ev. sec. 867): "The policy of the future * * * should be to receive all well-proved confessions in evidence, and to leave them to the jury, subject to all discrediting circumstances, to receive such weight as may seem proper." We have not yet arrived at that stage of development. There seems, however, to be a tendency in that direction. Years ago (1852) Lord Campbell, in *Regina v. Baldry*, 2 Den. Crown Cases, 428, 445, said, "If the matter were res integra I should perhaps have doubted whether it might not have been advisable to allow the confession to be given in evidence, and let the jury give what weight to it they pleased."

In some jurisdictions, where the evidence is conflicting, or the court is in doubt whether the confession is volun-

tary, the whole matter may be left to the jury. Note, 18 L. R. A. (N. S.) 777; 1 R. C. L. p. 578; *Wilson v. U. S.*, 162 U. S. 613, 16 Sup. Ct. 895, 40 L. Ed. 1090; *State v. Westcott*, 130 Iowa 1, 104 N. W. 341; *Comm. v. Preece*, 140 Mass. 276, 5 N. E. 494; *People v. Oliveria*, 127 Cal. 376, 59 Pac. 772; *People v. Prestidge*, 182 Mich. 80, 148 N. W. 347.

In the present case, the body and the stolen property of Selak were found as a result of information furnished by the defendants in their confessions. It was proper to admit evidence of that fact, even on the supposition that the confessions were improperly obtained. *Beery v. U. S.*, 2 Colo. 186 (1873). It was decided in that case by a divided court (2 judges to 1) that the fact that the prisoner produced gold dust and identified it as that which had been stolen, did not make admissible confessions that were induced by promise of favor, Chief Justice Hallett saying, "As to the accompanying declarations, extending beyond the identification of the gold-dust, the weight of authority appears to be against their admissibility." In other words, it was held that the fact that a confession improperly obtained is corroborated in an important particular, does not render the confession admissible. The effect of that decision was weakened by the able dissenting opinion of Mr. Justice Wells. Speaking of this dissenting opinion, Chamberlayne, in his Modern Law of Evidence (sec. 1614, note), says: "It would be difficult to state the logical effect of such a confirmatory discovery in any clearer way. * * * The conclusion of the learned judge seems eminently sound." Professor Wigmore (Ev. sec. 858) considers the rule criticised by Mr. Justice Wells as "artificial and against common sense"; and Chamberlayne (Mod. Law of Ev. sec. 1614) characterizes it as "the supreme triumph of procedure over logic, of technicality over reason." It is unnecessary at this time to determine whether the decision in the Beery case should be followed or over-

ruled. That question will be reserved for future consideration, if the occasion should arise.

This court, on repeated occasions, has said that, to be admissible, a confession must be voluntary, and that the question of admissibility is for the court. *Fincher v. People,* 26 Colo. 169, 56 Pac. 902; *Andrews v. People,* 33 Colo. 193, 79 Pac. 1031, 108 Am. St. Rep. 76; *Tuttle v. People,* 33 Colo. 243, 79 Pac. 1035, 70 L. R. A. 33, 3 Ann. Cas. 513; *Reagan v. People,* 49 Colo. 316, 112 Pac. 785; *Bosko v. People,* 68 Colo. 256, 259, 188 Pac. 743; *Goodfellow v. People,* 75 Colo. 243, 224 Pac. 1051. In *Martinez v. People,* 55 Colo. 51, 132 Pac. 64, Ann. Cas. 1914 C, 559, in a homicide trial, a witness testified that he slept in a bunk house with the defendant; that about half past one in the morning he heard the defendant exclaim, "I shot her! I shot her! I shot her! I had to do it to save myself from the pen"; that the witness thought the defendant was asleep, but did not know. In the opinion, Mr. Justice Garrigues said: "It is the voluntary statements of a party that may be used against him. One is not responsible for what he says in his sleep, because he is unconscious, and it is not voluntary.  *  *  * Where there is no doubt about the matter, and the evidence shows the accused was asleep when he spoke, the statement should be excluded by the court. Where there is a question as to whether the accused was conscious or unconscious when he spoke, it should be left to the jury under proper instructions." The jury, of course, is not permitted to pass upon the question of admissibility. The court having admitted the confession in evidence, it is for the jury to determine the weight to which it is entitled. The jury may accord to it great weight, little weight, or no weight at all, depending upon the circumstances surrounding the making of the confession. This ruling was made with reference to the character of a confession claimed to have been made during sleep. It would seem that the case is analogous to a confession claimed to have been involuntary because made as a result of improper

threats or promises. If this is true, it follows that where the court is in doubt whether the confession was voluntary or not, the evidence may be admitted, leaving it to the jury to determine the weight to which it is entitled under all the circumstances. The Martinez case was followed in *Taylor v. People,* 77 Colo. 350,. 237 Pac. 159. In the present case, having admitted the confessions, the court properly instructed the jury with reference thereto.

The word "voluntary" has been criticized as so indefinite and loose as to be of little assistance in determining whether a confession is or is not admissible; but it has been long and frequently used, and has acquired a meaning in the law of confessions that is fairly well understood. In *Buschy v. People,* 73 Colo. 473, 216 Pac. 520, we adopted and applied this test as the reasonable one: Was the inducement "sufficient to persuade one like the accused to confess falsely?" In *State v. Staley,* 14 Minn. 105 (cited in *Fincher v. People,* 26 Colo. 169, 56 Pac. 902), it was held that a confession procured by promises is admissible, unless the promises are calculated to make the confession untrue. In *Goodfellow v. People,* 75 Colo. 243, 224 Pac. 1051, there is an intimation, if not a direct holding, that, to make a confession involuntary because of a threat, the threat must have "influenced" the making of the confession.

In the light of this discussion, let us consider the confessions admitted in evidence in this case. The defendants' attorneys admit—and it is the law—that the finding of the trial court on conflicting evidence is conclusive on review. They say: "But we are not relying on evidence as to which there is any conflict. We are relying entirely, so far as the question of the admissibility of these confessions is concerned, on testimony which is absolutely undisputed and is for the most part, we may say, on the testimony of the people's witnesses themselves." Osborn did not testify, and there is no conflict in the evidence concerning the making of his confessions. Noakes testi-

fied before the judge in the absence of the jury. The trial court's findings on conflicting evidence cannot be disturbed, nor do counsel seek to disturb them. In their brief, the defendants' attorneys thus state what they claim to be the undisputed evidence with reference to the making of the confession of Noakes:

(1) "Nowhere in the evidence is it disputed in any manner that the Chief of Police told Noakes that if he would confess they *could not* hang him for it and that he was so told several times, almost every time he was taken before the Chief.

(2) "Nowhere in the evidence is there any contradiction of Noakes' statement that 'before I made the statement Chief of Police told me that they had a confession from Osborn and he said we done it.'

(3) "Nowhere in the evidence is there any contradiction of Noakes' statement to the effect that from the time he was put in the dark cell Monday morning until he made the statement he had nothing to eat or drink. That although he asked for water, he did not get any water. That he did not get anything to eat until after the so-called confession was taken down and he was put in the hospital ward."

As to the first. On direct examination Noakes was asked, "What statement was made to you before your statement was taken, with regard to any promise of benefit you may receive if you made the statement, or any injury that you might suffer if you did not?" He answered, "Chief Reed said if I *plead guilty,* they *wouldn't* hang me," etc. On cross-examination, the district attorney asked, "Now you say that the chief of police told you that if you would *confess,* that they *could not* hang you for it; is that correct?" Noakes answered, "He did." The district attorney did not accurately recall the words used by Noakes. But the substance was the same. Chief Reed testified: "I did not tell him that he would hang for it, if he did not make a statement. * * * No one in my presence told him" that. "I did

not tell Noakes that if he plead guilty, he could not be hanged, and nobody said any such thing in my presence, that I recall." Reed was asked to state whether or not there was anything said in the way of threats or *promises or inducements*. He answered, "Absolutely none." "Q. Was there, to your knowledge, at any time? A. None whatever." Geiger, who was present when Noakes confessed, and who heard the conversation preliminary to the confession, testified as follows: "Q. And what, if anything, was said in your presence to Noakes about making a statement? A. Why, the chief just told him—asked him if he had anything to say. The chief told him anything he might say might be used for or against him, and it was a voluntary statement. *That is about all*." O'Brien testified: "I heard the conversation preliminary to the statement. * * * The chief warned him that anything he may say might be used for or against him at the trial. *I don't believe there was anything else said at that time about that*." Cole, who also was present, said, referring to Noakes' testimony that the chief told him that if Noakes would plead guilty, they would not hang him, "Nothing of that kind occurred in my presence." Hadley testified to the same effect. It appears, therefore, that Noakes' testimony was disputed. The trial court was justified in believing the witnesses for the people and in disbelieving Noakes.

As to the second. The authorities agree—Professor Wigmore (Ev., sec. 841) says that the principle "is and always has been universally conceded"—that the use of a trick or fraud (however reprehensible in itself) does not of itself exclude a confession obtained by means of it. See Chamberlayne, Modern Law of Evidence, sec. 1538a. Thus, a false statement that an accomplice had confessed, or had implicated the accused, is not sufficient to exclude a confession. *Price v. State*, 18 Ohio St. 418; *Fife v. Com.*, 29 Pa. State (5 Casey), 429, 435; *State v. Wilson*, 172 Mo. 420, 72 S. W. 696. See also where the sheriff led the accused to believe—what was untrue—

that the latter's accomplice had betrayed him. *State v. Rush,* 95 Mo. 199, 8 S. W. 221. See note, 18 L. R. A. (N. S.) 840. By itself, therefore, the false statement made to Noakes that Osborn had confessed did not render the confession inadmissible. It should, however, be considered in connection with the other evidence of the treatment of Noakes, in determining whether or not the confession of Noakes was voluntary.

The third proposition of counsel requires consideration in connection with the second. The force of counsel's statement is somewhat weakened by certain circumstances appearing in the record. It was not denied that he had nothing to eat from the time he was put in the dark cell until he made his statement. There is evidence that he was put in the dark cell around 10 or 11 o'clock in the morning, and that he made his statement somewhere between 3 and 5 o'clock in the afternoon of the same day. Cole testified that it was "about 3 or 4 o'clock. * * * It was not after dark; it was in the afternoon." So it appears that Noakes missed his lunch. It does not appear that he asked for lunch, or that he was hungry, or that he mentioned the matter to the chief of police, which he had ample opportunity to do. He testified, "I asked some one in jail I saw for some water, and they said they would get it, but they did not bring it to me; but I did not tell the chief about it at all." He admitted that whatever he asked for "in the way of smoking," he got from the chief of police. Chief Reed testified that he issued no orders that Noakes was not to have "even a drink of water" until he confessed. As the chief gave him a cigarette when he asked for it, would the court be justified in assuming that lunch and water were deliberately withheld to "torture" Noakes into making a confession? Can we say that, in refusing to draw such an inference, the trial court committed error? The remaining charge is, that after refusing to answer questions, Noakes was put in solitary confinement in a cell that has been referred to as "the hole." This cell,

the chief testified, was not different from any other cell, except that it was dark. There was no bunk in it— "nothing in there; the four walls, the floor and the ceiling." According to the chief, he ordered Noakes put there "because he did not want any one to talk to him." But why the darkness? Why the absence of chairs? Why the absence of everything, except "the four walls, the floor and the ceiling"? Is there any reasonable connection between these conditions and the purpose that the chief claims he had in mind? We fail to see it. The claim is a palpable pretense, too flimsy to deceive even a child. Whenever police officers, through mistaken zeal and a false idea of their duties and rights, resort to such methods, they imperil the conviction in every case where a confession is introduced in evidence. This situation presents the most serious and the most difficult question with which we have to deal in this case. Should the judgment be reversed because of these matters?

The case of *State v. McCullum,* 18 Wash. 394, 51 Pac. 1044, more nearly resembles the present case than any other case cited by the defendants' counsel. In that case, upon the defendant's denying all knowledge of the transaction, the chief of police sent the defendant to a dark cell, known in police circles as the "sweat box." He was kept there several days until he confessed, whereupon he was removed to better quarters. During his confinement, he was visited daily by one of the officers, who asked him "if he was ready to confess." The chief testified: "Q. You had McCullum placed in what is known as the dark cell in order to extort a confession? A. I had him placed in a dark cell, yes, sir. * * * Q. If he had made a confession, he would have had better quarters, that is, you would have taken him out of the dark cell? A. Yes, sir. * * * Q. You kept him in a dark cell until he confessed? A. Yes, sir." In the opinion, the court said: "To keep an accused person in a dark cell in order thereby to obtain a confession from him is to punish him for refusing to confess,

and the act of so keeping him constitutes in itself a continuing threat. * * * the practice of extorting confessions from persons accused of crime by confining them in dark cells until a confession is wrung from them, is a practice that cannot be condemned too strongly. It cannot receive judicial sanction.''

That case concerned the King county jail, a jail that seems to have given the courts considerable trouble. The custom prevailing there in the matter of extorting confessions with the aid of this same ''black hole'' is described at length in *State v. Miller,* 61 Wash. 125, 111 Pac. 1053, Ann. Cas. 1912 B, 1053. If the same practices prevailed when the McCullum case, supra, was decided, they must have had considerable notoriety. Solitary confinement in a dark cell continuously for several days and nights may have the effect upon some persons of inducing a confession, especially if they are timid and have but slight power of resistance; whereas, it may not have such effect upon others. Each case depends upon the circumstances of that particular case. It was for the trial court to determine whether the confinement of Noakes from between 10 and 11 o'clock in the morning to between 3 and 5 o'clock in the afternoon of the same day, under the conditions described, influenced Noakes to make a confession (*Goodfellow v. People,* 75 Colo. 243, 224 Pac. 1051); and whether it constituted a sufficient inducement to persuade or lead Noakes to confess falsely. *Buschy v. People,* 73 Colo. 472, 474, 216 Pac. 519; *State v. Staley,* 14 Minn. 105; *Fife v. Com.,* 29 Pa. (5 Casey) 429.

Counsel also cite what is known to the profession as the ''sweat box'' case, *Ammons v. State,* 80 Miss. 592, 32 So. 9, 18 L. R. A. (N. S.) 768, 92 Am. St. Rep. 607. There, for several days during the heat of summer, the accused was kept in what was known as the ''sweat box.'' We quote from the opinion: ''This was an apartment about five or six feet one way and about eight feet another. It was kept entirely dark. For fear that some stray ray

of light or breath of air might enter without special invitation, the small cracks were carefully blanketed. * * * This, with the hot weather of summer, and the fact that the prisoner was not provided with sole leather lungs, finally, after 'several days' of obstinate denial, accomplished the purpose of eliciting a 'free and voluntary' confession. * * * He [the officer] says, in regard to the patient, Ammons, 'I went to see this boy every day, and talked to him about the case, and told him *it would be better* for him to tell the truth; tell everything he knew about the case.' * * * Speaking of this apartment, and the habit as to prisoners generally, this officer says, 'We put them in there [the sweat box] when they don't tell me what I think they ought to.' This is refreshing. The confession was not competent to be received as evidence. * * * Defendant, unless demented, understood that the statement wanted was confession, and that this only meant release from this 'black hole of Calcutta.' ' ''

In the present case, Noakes was in solitary confinement but a few hours, not several days; there is nothing to indicate that he suffered from want of air, or because of heat. True, he did not have the comfort that a light and a chair would have afforded. However, he did not, when he testified, and he does not now, claim to have suffered by reason of these conditions, or to have made his confession because of them, or in order to avoid their continuance. Not that it is necessary for him to do so in order to entitle him to raise the point; but the fact that he did not do so is a circumstance that it was proper for the trial court to consider. There are a number of other circumstances in the present case that were not present in the Washington and Mississippi cases, supra. When Noakes commenced his confession, he was asked, "You want to make this statement and tell all about it voluntarily?" He answered, "Yes." At the conclusion he was asked, "You have made this statement of your own accord?" He answered, "Yes, sir." In *O'Donnell*

*v. People,* 71 Colo. 113, 204 Pac. 330, we held that where a statement contains an admission that it was freely and voluntarily made, without threats or promises, and the admission is supported by testimony, the statement is admissible in evidence. Three days after those conditions were removed, Noakes heard Osborn make his confession in Denver, and did not deny any part thereof that referred to him (Noakes), though he was at liberty to do so, and, if innocent, naturally would have done so. *Andrews v. People,* 33 Colo. 193, 79 Pac. 1031, 108 Am. St. Rep. 76; Chamberlayne, Modern Law of Ev., sec. 1566; *Com. v. Brown,* 121 Mass. 69. When the Osborn confession was typewritten, Noakes read it over. He not only did not deny what the confession contained with reference to him, but he orally "verified" the confession.

In his testimony, Noakes did not say or claim that his confession was given because of any hope of benefit or favor, or of any fear of harm or disadvantage, caused by any promises or threats, either express or implied. It was not, and it is not, contended by Noakes, or in his behalf, that either his confession or Osborn's confession is false, or even inaccurate, in any particular. To make a confession involuntary because of promises or threats, the promises or threats must have induced the confession; there must be a connection between the promises or threats and the confession; the confession must have been caused, prompted or produced by the promises or threats. In *Beckham v. State,* 100 Ala. 15, 14 So. 859 it was held (quoting from the syllabus), "The exclusion from the jury of a confession rests on its connection with the inducement; they stand to each other in the relation of cause and effect, and if it is apparent that no such connection exists, there is no reason for the exclusion of the evidence." If promises or threats do not "have the influence to induce" the confession, the confession must be referred to other motives. See *Goodfellow v. People,* 75 Colo. 243, 224 Pac. 1051; *State v. Grover,* 96 Me. 363, 52 Atl. 757; *Cady v. State,* 44 Miss. 332; *Spears v. State,*

2 Ohio St. 583; *State v. Hopkirk,* 84 Mo. 278; *Hawkins v. State,* 7 Mo. 190. We are aware of the fact that there are decisions that hold that the probable, not the actual, effect of the inducement is the sole question for consideration; that no inquiry is made into the share of influence that the inducement had in evoking the confession; and that if the inducement was present, it is presumed that it operated. It is impossible to reconcile such rulings with the cases just cited. It would seem that such rulings are the survival of the artificial conception of early days. We cannot reconcile them with reason. If promises or threats do *in fact* cause or induce the accused to confess, the confession is involuntary; if the promises or threats do not *in fact* cause or induce the accused to confess, it is but common sense to say that the confession is voluntary. It is no answer to say that we cannot explore the human mind. We do explore the human mind when, in prosecutions for obtaining property by false pretense, we require the jury to ascertain the intent with which the pretense was made, and also to ascertain whether such pretense induced the prosecuting witness to part with his property—in other words, to ascertain the effect that such pretense had in fact upon the mind of the prosecuting witness. So also when, in prosecutions for burglary, the jury is required to ascertain with what intent the defendant made the entry. So also when, in trials for assault with intent to commit murder or rape or to do bodily harm, the jury is required to ascertain with what intent the defendant made the assault. The same is true in trials for robbery with a deadly weapon with intent, if resistance is offered, to kill, maim, or wound. And in cases where a body execution is sought, the jury is required to ascertain from all the evidence whether, in committing the tort complained of, the defendant was guilty of actual malice—malice in its odious sense. The list is long; the books abound in similar examples. Those we have given are sufficient for our present purpose.

In *Fincher v. People,* 26 Colo. 169, 173, 56 Pac. 902, 904, we quoted the following from 1 Greenleaf on Evidence, sec. 219: "The material inquiry, therefore, is, whether the confession has been *obtained* by the *influence* of hope or fear applied by a third person to the prisoner's mind. The evidence to this point, being in its nature preliminary, is addressed to the judge, who admits the proof of the confession to the jury, or rejects it, as he may or may not find it to have been *drawn from the prisoner,* by the application of these motives."

Such we hold to be the law. The attorneys for the defendants admit that, on conflicting evidence, the finding of the trial court is conclusive on review. The law goes farther. It is also for the trial court to draw inferences from the undisputed facts, and the trial court's decision should not be reversed "unless the contrary inference is the only reasonable one." *State v. Grover,* 96 Me. 363, 52 Atl. 757. It was for the trial court, before passing upon the admissibility of the confession, to determine, not only from the conflicting evidence, but also by drawing inferences from such of the evidence as was not disputed, whether or not the confession was *in fact* "obtained by the influence of hope or fear" applied to the prisoner's mind by the police officers; whether or not the confession was *in fact* "drawn from the prisoner by the application of these motives." Whether or not a confession was voluntary, is primarily a question for the trial court. Its admissibility is largely within the discretion of that court; and on review, its ruling thereon will not be disturbed, unless there has been a clear abuse of discretion. *Mitchell v. People,* 76 Colo. 346, 232 Pac. 685, 40 A. L. R. 566.

In admitting the confession of Noakes, the trial court did not abuse its discretion.

It is claimed that the Osborn confessions should not have been admitted, because of certain words admittedly used by the Denver chief of police (Reed) while talking

to Osborn at Hot Sulphur Springs. The chief of police talked to Osborn a few minutes in the sheriff's house. Osborn talked very little, and the chief said: "Son, if you maintain your present attitude, you will probably get your neck cracked." There was nothing whatever to lead Osborn to suppose that this meant that some person was about to do him personal injury if he did not confess. At most, it meant, and must have been understood as meaning, that if Osborn continued to maintain silence; to offer no explanation of his whereabouts at the time Selak was killed; to say nothing to relieve himself from the suspicion that he was a party to the homicide—nothing in defense, or even in mitigation; to say nothing that would enable the officers to hunt the real criminal, if Osborn had no part in the homicide—such silence might result in Osborn's being convicted of murder, and suffering the highest penalty for that crime. This was the only thing said to Osborn, or in his presence, upon which to base any claim that a threat was used. The chief of police testified that there were no promises or threats, or anything of that kind. The chief had already obtained a full confession from Noakes. That confession described in detail the hanging of Selak and Osborn's part in the transaction. As Osborn would make no statement at the sheriff's house, they started to return to Denver. On the way, the officers and newspaper reporters discussed the case and the statement that Noakes had made. As the defendants' counsel say in their brief, the police officers "go to Osborn and tell him that Noakes has confessed, in order to get him, Osborn, to confess." After hearing for some time the discussion of the facts, Osborn said: "Well, I guess you fellows know what you are talking about, all right. I might as well tell you, I took the old son-of-a-bitch out and strung him up"; and then in great detail told how he and Noakes had killed Selak. He then directed the

officers to the place where Selak's property was hidden; and described, and in the darkness tried to find, the place where Selak's body was hanging to a tree. The property was found that night at the place designated; and later the body was found at the place described by Osborn. Three days later (August 19) Osborn made a confession (Exhibit K) in the office of the chief of police. It was taken down in shorthand and was typewritten, was read by Osborn, and by him declared to be correct. The next day Osborn made another confession (Exhibit L) in the chief's office. This also was typewritten, read by Osborn, and declared to be correct. Before Osborn made these statements in Denver, he was cautioned that whatever he might say may be used for or against him. Later, Osborn and Noakes were brought to the chief's office and questioned, "and each of them [orally] verified the statement of the other." It is a fair inference— one that the court would be justified in making—that Osborn was not influenced or caused or induced to confess by the words of Chief Reed, but by the following considerations: From the conversation in the automobile, Osborn realized that the officers knew the truth, and, knowing that he was guilty, he no doubt concluded that it was useless for him longer to remain silent. And when, in the chief's office in Denver, he was brought face to face with Noakes, who, as Osborn knew, had already confessed, Osborn must have realized still more keenly the futility of withholding a full statement of the truth. The trial court, in admitting these several confessions of Osborn, did not abuse its discretion.

At no time after the defendants made their formal pleas of not guilty was it claimed, or even suggested, by the defendants, or in their behalf, that they did not commit the homicide. Not a word of testimony was offered by them, or in their behalf, or at all, indicating, even remotely, that they did not kill Selak. Indeed, at the close of the people's case, each of the defendants, in

support of the application to have Dr. Tepley subpoenaed, swore, "that this affiant has *no other defense* save that of insanity." In other words, after having ample time—several months—to deliberate, during which time they were in consultation with their attorneys; at a time when it is not claimed that they were under the influence of any promise or threat; both defendants solemnly admitted, in effect, that they committed the homicide, and that unless they were mentally incompetent at the time of the homicide, they are guilty of murder in the first degree. There was no evidence introduced at the trial that would justify a finding that either of the defendants was insane, or that raises a reasonable doubt, or any doubt whatever, with reference thereto. If the expert that the defendants sought to have subpoenaed in their behalf at the expense of the public is of the opinion that either of the defendants was insane at the time of the homicide, the governor is the one, and the only one, who has authority to consider the matter at this time. At the trial, both defendants were proven guilty of murder in the first degree; they were proven guilty, not only beyond a reasonable doubt, but beyond the possibility of a doubt. All the matters relied upon for a reversal were presented to the trial court and argued on the application for a new trial, and the trial court denied the application. We discover no reversible error in the record. The judgment is affirmed. It is ordered that the judgment be executed during the week commencing Monday, the 26th day of March, 1928.